PADGETT *v.* STATE.

Opinion delivered October 23, 1916.

1. CRIMINAL LAW—HOMICIDE—SUFFICIENCY OF THE EVIDENCE.—Where appellant was convicted of homicide, *held,* under the evidence that the court, on appeal, could not say as a matter of law, that there was no substantial testimony to sustain the verdict.

2. APPEAL AND ERROR—OBJECTION TO TESTIMONY—MUST BE MADE WHEN.—An objection to the admission of testimony cannot be made for the first time on appeal.

3. EVIDENCE—PERFORMANCE OF BLOODHOUNDS.—Evidence of the performance of bloodhounds is admissible when the proper foundation for the introduction of such testimony is laid.

4. EVIDENCE—EXCLUSION OF INCOMPETENT PORTION—GENERAL OBJECTION.—Where a portion of a narrative detailed by a witness is competent, it is the duty of the appellant to object specifically to the portion complained of as incompetent, and a general objection is insufficient.

5. EVIDENCE—WIFE AS WITNESS IN CRIMINAL CASE.—A married woman cannot testify in behalf of her husband in a criminal case, and this rule is not changed by Act 159, Acts of 1915.

Appeal from White Circuit Court; *J. M. Jackson,* Judge; affirmed.

### STATEMENT BY THE COURT.

Appellant prosecutes this appeal from a judgment of conviction for the crime of assault with intent to kill one F. D. Worthington. On the night of January 11, 1916, at about 8 o'clock p. m., someone shot F. D. Worthington while sitting by the fire in his home at Beebe, White County, Arkansas. Immediately after the shooting a Mrs. Kimbro, who lived within two blocks of Worthington's, testified that she saw two men going from his house. They passed by and she saw them by an electric light. They were walking very fast. One of the men was about as tall as Sidney Padgett, but not any taller. The other man was lower than Padgett. They were going east towards the railroad. The next morning the dogs seemed to be following the course that the men took.

Another neighbor, Mrs. Robertson, stated that immediately after Worthington was shot she saw two men who passed within eight feet of her. She saw them plainly by the electric light. One of them was a good-sized man. The other was lower, and heavy set. One of them was a negro. The larger man was a white man, and he had on a brown suit. Both of them had on black slouch hats that were pulled down over their faces. Each of them had their hands down like they were holding something. The men went down by Mrs. Kimbro's.

Immediately after the shooting one Billings and one Thompson were on the street on the west side of the railroad and saw two men running across the railroad track just ahead of a train. The men were coming from the direction of Worthington's, in a roundabout way. The larger man had on a dark corduroy suit; he had something in his hand. Billings testified that one of the men that crossed the track was about the size of Padgett, but he did not know who it was. Neither one of them was a negro. Witness Thompson testified that he saw the two men, as stated by Billings; that one was about four inches taller than the other,

and the taller one had on a corduroy suit, and a cap on his head, and a gun in his hands. He knew Sidney Padgett and since that night he had seen him dressed in a corduroy suit and walking across the grand jury room. The same man that witness saw in the grand jury room was the man that witness saw that night cross the railroad, according to witness' best judgment. The man was Sidney Padgett. Witness went with the bloodhounds the next morning. The dogs crossed the railroad track at the same place the men crossed it. They went to Sidney Padgett's house; ran up to his house and stopped. Witness did not know whether the other man was a negro or not. He took them both to be white men. Witness went with the sheriff and others with the dogs on their last chase; he did not go with them on the first chase, where the dogs first went that night. It was between 4:30 and 5 o'clock on the following morning, after the shooting, when they reached Sidney Padgett's house. The road was muddy, and those in the party were very muddy and wet when they reached his house. They could not get there without getting muddy and wet.

After the shooting that night officers had bloodhounds brought from the town of Forrest City. They had been used for trailing human beings, and their capacity for trailing people was good. They had a reputation of being reliable for trailing people. They arrived in Beebe about 2 o'clock in the morning and went directly to Worthington's house. They picked up the trail and went in a westerly direction. They went in the yards of several people in going that route. When the dogs would get lost from the trail the parties in charge would take them back and put them on the trail again. They lost completely the west track, which they first started on and which led to the west part of town. The dogs were tracking a human being from the point where the man stood who shot Worthington to the west side of town, where the trail was lost. After they lost that trail they were taken back to the starting point. They then went in a northeasterly

direction, different from the one they first followed. When they were put on the trail the second time they trailed up to the steps of one or more houses. The dogs lost the trail so badly that the party in charge took them off, rested them awhile and washed out their mouths and noses. It rained some before they arrived at Padgett's house. The ground was very muddy. The dogs led the party to Padgett's house. There were two men in the house when the party arrived at Padgett's. The dogs barked some while they were on the west trail, and also while they were on the last trail that led to Padgett's house. The sheriff went in ahead of the dogs and arrested Padgett, placing handcuffs upon him. He seemed to be excited. The sheriff took charge of the trousers which were exhibited, and which Padgett had on the night of the killing. They did not have much mud on them. His shoes and trousers were dry. The sheriff also took charge of the coat and a cap which Padgett was supposed to have had on that night.

The sheriff testified, on cross-examination, that he knew where he was going; that he was at Padgett's, and that he went ahead of the dogs and got him; asked for the suit that he wore the night before and the corduroy suit described was presented to him. His shoes were not near so muddy as witness expected to find them. In going out the sheriff and posse got their clothes covered with mud. They found in Padgett's house a No. 12 shot gun; found a shell or two in his coat pocket, but those shells were loaded with small shot, and not buckshot. Padgett complained of being sick.

Other witnesses testified as to the manner in which the dogs trailed that night; that they got on trails and went to other houses also and last went to Padgett's house. One of the witnesses who was in the crowd following the dogs stated that when the dogs stopped and went into another man's house witness remarked, "We know where we have started and we had just as well go down there and get him." This witness stated

that when they reached Padgett's house Padgett was in bed; he complained of being sick. They called for his clothes and they were promptly furnished. They found nothing unusual about them. There was nothing on his shoes or clothes to indicate that he had come over the trail that the dogs followed. The dog, when he went into Padgett's house and walked up to Padgett, seemed to be perfectly satisfied, but he didn't bark and whine nor attempt to jump on or bite Padgett.

A certain witness, a detective, was employed from the Burns Detective Agency and while Padgett was in jail at Newport he went there and remained in the cell with Padgett for fourteen days, having been arrested at the depot on a pretext and handcuffed and placed in jail like other prisoners. Witness represented to Padgett that he had been arrested and placed in jail for robbing a bank. The witness then detailed the conversation which he had with Padgett, the effect of which was that Padgett told witness that he was in jail charged with shooting a man named Worthington. Padgett told witness that he shot Worthington, and entered into details as to the cause of the shooting and the circumstances.

The testimony on behalf of the appellant tended to show that appellant was sick with lagrippe on the night of the shooting of Worthington and had a fever that night. The physician attending testified that Padgett on that night was a very sick man and was suffering from fever. He left the physician's office about 5:30 o'clock. He was advised by the physician about 5:30 in the afternoon to go home and go to bed. The physician was of the opinion that he was not out of the house that night.

The testimony by several witnesses was to the effect that at 8 o'clock the night of the killing he was in his own home, engaged with his family and others in a game of cards, and continued to play until about 8:30, at which time he retired and did not leave the house that night.

F. M. Jarvis testified that about 7 o'clock on the night of the shooting he went to Padgett's house; Padgett was there. Witness remained until about 8:30 and Padgett did not leave the house while witness was there. While there they heard over the telephone that Worthington was shot. Witness testified that he was arrested in connection with the shooting of Worthington; that while he was in jail he met a man by the name of Carr.

On cross-examination he was asked this question: "Didn't you tell Mr. Carr that they had the right man, referring to Sidney Padgett?" Witness answered, "No, sir, I did not; I did not tell Mr. Carr any such thing as that."

In rebuttal witness Carr testified that he had been in jail with F. M. Jarvis and had a conversation with him about the shooting of Worthington. Jarvis said he (Jarvis) was innocent of it, but that they had the right party.

*John E. Miller*, for appellant.

1. Counsel reviews the testimony and contends that there is no legal or credible evidence on which to base a conviction; that the verdict is the result of passion and prejudice, based upon a "frame up" of testimony, and that the alleged confession is not sufficiently corroborated.

2. The testimony relative to appellant's alleged admissions that he had killed another man and had been acquitted thereof under an alibi, and of his being a member of a whiskey faction in Beebe, etc., was incompetent, was intended only to discredit him in this trial and to destroy the force of his defense in this case. The court erred in admitting such testimony.

3. The jury should have been instructed to disregard the testimony concerning the trailing by the dogs, and the court erred in failing to so instruct.

4. The testimony of the witness Carr to the effect that Jarvis, a witness for appellant, told him that he, Jarvis, was not guilty but that he thought they had the

right 'party, referring to appellant, was not admissible under any theory of the case, and its admission was reversible error.

5. The court erred in excluding the testimony of appellant's wife, offered to contradict the testimony of the sheriff. Act 159, Acts 1915; 124 Ark. 167.

*Wallace Davis*, Attorney General, and *Hamilton Moses*, Assistant, for appellee.

1. There was no error in failing to charge the jury to disregard the testimony relative to the trailing by the bloodhounds. They were proved to have been trained in the trailing of human beings and reliable. Moreover, appellant did not call this matter to the court's attention by requesting an instruction on the point.

2. There was no error in the admission of testimony. As to that of the detective, Whitfield, and the confession of the appellant detailed by him, the court fully and fairly instructed the jury as to the admissiblity of confessions and as to the weight to be given them under all the circumstances. Confessions fairly and voluntarily made are admissible in evidence. 73 Ark. 497; 93 Ark. 156; 109 Ark. 366.

3. Carr's testimony as to what Jarvis told him to the effect that he thought they had the right party, meaning the appellant, was admissible for the purpose of contradicting his other testimony to the effect that he was at appellant's home playing pitch with him and other members of his family at the time of the shooting.

4. The wife's testimony was properly excluded. Act 159, Acts 1915, does not apply to the admission of testimony, neither does it repeal or conflict with the rule of evidence established in this State that a husband and wife are incompetent to testify for or against each other. Kirby's Digest, § 3095; *Id.* 3092; 84 Ark. 119.

WOOD, J. (after stating the facts.) No objection is urged in the brief of counsel for the appellant to the instructions of the court. We assume therefore that the instructions were correct.

(1)    Appellant contends that the evidence is not sufficient to sustain the verdict.    The issue of fact as to whether or not the appellant shot Worthington, as charged in the indictment, was for the jury to determine. The court cannot say as a matter of law that there was no substantial testimony to sustain the verdict.

(2-3)    Appellant urges in his brief that the court erred in not instructing the jury to disregard the testimony concerning the trailing by the bloodhounds, but there was no objection to this testimony when offered and no prayer for such an instruction.    The appellant therefore cannot now complain of the ruling of the court in permitting this testimony.    Moreover, the proper foundation was laid for such testimony, and this court, in *Holub* v. *State*, 116 Ark. 227, held that such testimony was competent.

(4)    Appellant insists that the court erred in permitting witness Whitfield to detail an alleged conversation which he had with appellant, in which appellant in alleged to have told witness about shooting a man other than Worthington, and about certain car robberies, and about being a member of the whiskey faction in Beebe, and having the judge and the prosecuting attorney under his control.    When the witness began to detail the conversation with appellant while in jail, the record shows that counsel for appellant said: "Let the record show we object to all this testimony," and after the witness had given his testimony in chief the record shows the following:  "The defendant objected to the witness being permitted to detail to the jury the conversation and statements made to him by the defendant while in jail at Newport."    Thus it appears that only a general objection was saved to the testimony of the detective Whitfield.    No specific objection was made to the testimony on the grounds now urged here.

Some of the testimony of Whitfield was at least competent evidence on behalf of the State, and if appellant wished to have that part of it which he now claims to be incompetent excluded he should have called the court's attention specifically to that part of the

testimony which he now claims was objectionable, and not having done so, objection here for the first time cannot avail him. See *Kansas City So. Ry. Co.* v. *Leslie,* 112 Ark. 305.

Counsel for appellant contend that the court erred in permitting the State to prove by the witness Carr that appellant's witness Jarvis had told him that he was innocent of the crime himself, but that he thought they had the right party. The proper foundation was laid for the introduction of this testimony, in contradiction of witness Jarvis, and there was no error in the ruling of the court admitting the testimony.

A witness by the name of McQuiston testified that while the appellant was in jail in Jackson county he heard a conversation that appellant had with his wife by means of a dictograph. Witness heard appellant tell his wife "that if they knew what he knew the whole bunch would be gone." Witness did not know to whom appellant referred.

(5) The appellant offered to prove by his wife that he never made any such statement as the witness detailed. The court refused to allow the wife of appellant to testify. Appellant duly objected and excepted to the ruling of the court, and urges this as a ground for reversal. Under our statute the appellant's wife was not a competent witness in his behalf. See Kirby's Digest, §§ 3095 and 3092; *Woodward* v. *State*, 84 Ark. 119. This statutory rule of evidence is not changed by Act 159 of the Acts of the General Assembly of 1915, giving to married women all the rights to contract and be contracted with, to sue and be sued, and in law and equity to enjoy all rights and be subjected to all the laws of this State, as though she were a *femme sole*. This last act has no reference to rules for the production of evidence.

We find no reversible error in the record, and the judgment is therefore affirmed.