WITHAM *v.* STATE.

Opinion delivered June 20, 1921.

1. HOMICIDE—INSTRUCTIONS.—Where in a prosecution for murder there was evidence tending to prove that bad blood existed between deceased and defendant, and evidence tending to disprove that the killing was in self-defense, instructions upon murder in the first degree and upon murder in the second degree were not abstract.

2. HOMICIDE—ABSTRACT INSTRUCTIONS HARMLESS WHEN.—When, under an indictment for murder, defendant was convicted of manslaughter, error in giving abstract instructions upon the higher degrees of homicide, or upon the subject of malice and premeditation, were not prejudicial to defendant.

3. HOMICIDE—INSTRUCTION AS TO VARIOUS DEGREES.—An instruction, in effect, that if the jury found appellant was not guilty of murder in the first degree they might find him guilty of a lesser degree of homicide was not objectionable as impressing upon the jury that the court wanted the defendant convicted of some degree of homicide where the court told the jury that it was their duty to acquit defendant unless they were convinced beyond a reasonable doubt of his guilt.

4. HOMICIDE—SELF-DEFENSE—QUESTION FOR JURY.—Where the evidence was in dispute as to whether defendant employed all the means within his power, consistent with his safety, to avoid the danger to himself, and as to whether the danger was so urgent and pressing that it was necessary to kill deceased in order to save his own life, it was proper to submit that question to the jury.

5. HOMICIDE—EVIDENCE OF FAMILY QUARREL.—Evidence of a family quarrel which took place shortly before the killing was admissi-

ble where it tended to establish a motive for the killing and to show who was the probable aggressor.

6.  HOMICIDE—COMPETENCY OF EVIDENCE.—Evidence that deceased was on his way to a neighbor's house to sell some mules was properly admitted as tending to prove that deceased stopped at defendant's home on his way to such neighbor's, without intention to kill defendant or do him bodily harm.

7.  HOMICIDE—EVIDENCE—PHOTOGRAPHS.—Photographs purporting to represent the environment of the killing, being properly verified, were competent to show the situation of the parties and the place and conditions connected with the fatal rencounter.

8.  HOMICIDE—EVIDENCE—HARMLESS ERROR.—The error, if any, of permitting the State to prove that six years before the killing the witness heard defendant say that he grudged deceased the ownership of his land, and that some day he would acquire it himself, was not prejudicial as it tended merely to prove malice, which was eliminated by the verdict of manslaughter.

9.  WITNESS—INCOMPETENCY OF WIFE TO TESTIFY FOR HUSBAND.—Act 159 of 1915 and act 66 of 1919 have not changed the status of married women so as to render her competent to testify in her husband's behalf in criminal cases.

Appeal from Saline Circuit Court; *W. H. Evans,* Judge; affirmed.

*Mehaffy, Donham & Mehaffy,* for appellant.

1. The court erred in its instructions to the jury, and in its rulings as to the admission of testimony. The wife of defendant should have been allowed to testify. The married woman's acts of 1915 and 1919 have entirely changed the law as to the admission of the testimony of married women for or against their husbands as found in C. & M. Digest, § 3406.

2. The uncontradicted proof that the deceased was the aggressor, and that appellant acted in necessary self-defense. The jury arbitrarily disregarded the evidence, and the verdict is contrary to the law and the evidence.

*J. S. Utley,* Attorney General, *Elbert Godwin* and *W. T. Hammock,* Assistants, for appellee.

1. There was no error in the instructions given or refused. Appellant was in no way prejudiced by any of the instructions. 109 Ark. 134. Where, under an indict-

ment for murder, defendant is convicted of manslaughter, error in defining the higher grades of homicide is not prejudicial. 60 Ark. 76.

2. There was no error in giving the instructions requested by the State. Malice is an essential ingredient of the crime of murder either in the first or second degree. It may be either express or implied. C. & M. Dig., §§ 2340-1. 136 S. W. 316-22; 3 Words & Phrases (N. S.), p. 462. Even if the court did err in its instructions defining malice, appellant was only convicted of manslaughtr, and was not prejudiced.

3. There was no error in giving the State's request for instruction No. 4. The premeditation and deliberation and determination to do murder may be formulated in the assailant's mind upon the instant; it does not have to exist any appreciable length of time. It is only necessary that it exists when the assailant commits the crime. 133 Ark. 321. But, if the instruction was error, it was not perjudicial. 60 Ark. 76.

4. No proper exceptions were saved nor objections made to the other instructions. 93 Ark. 401.

5. Photographs are admitted as evidence. Underhill's Cr. Ev., § 50; 1 Wigmore on Ev. 792; 103 N. Y. 487; 91 Ark. 179.

6. There was no error in refusing to permit defendant's wife to testify. C. & M. Dig., § 5577; Act 159, Acts 1915; Act 66, Acts 1919. This case is exactly in point with 125 Ark. 471 and is settled by that case.

7. There were no prejudicial errors of law and the verdict is supported by the evidence.

HUMPHREYS, J. Appellant was indicted and tried in the Saline Circuit Court of murder in the first degree, for killing W. L. Pritchard, on the 14th day of January, 1920, in the county of Saline and State of Arkansas, convicted of manslaughter and adjudged to serve a term of three years in the State penitentiary as punishment therefor. From the judgment of conviction, an appeal has been duly prosecuted to this court.

The evidence adduced on behalf of the State is, in substance, as follows: The deceased and accused resided

on adjoining farms, their homes being between two and three hundred yards apart. An old shop stood close to the fence and near accused's home. A sign, directed to keep people out, was posted by the accused on his property near the division line between the two places. So far as appears from the record, the family of deceased consisted of himself, his wife, Mattie Pritchard, two sons, Hampton and Henry, a daughter, Rosie, and two smaller children. The family of the accused consisted of himself, his wife, Matt Witham, a son, Loy, and a daughter, Grace. Mrs. Effie Hoskins, widow, and a daughter of the accused, resided, with her children, consisting of Julia Hoskins and others, upon his place, about three hundred yards distant from his residence and also from the residence of deceased. Both the accused and deceased had bought their respective farms some years prior to the killing, from the father of Mrs. Mattie Pritchard. The accused had tried to purchase the deceased's farm on several occasions. During the course of the trial, over the objection and exception of appellant, Mart Kelt, a witness for the State, was permitted to testify that appellant stated to him, some six years before the killing, that some day he would acquire deceased's place in some way. Ill feeling arose between the accused and deceased in the spring of 1919, occasioned, first, by the accused's dog biting deceased's girl; next, by accused's son cursing deceased's wife; next, over a small indebtedness of deceased to accused; then by a family quarrel during the afternoon before the killing on the night of January 14, 1920. This family quarrel was instigated by Grace Witham, daughter, and Julia Hoskins, granddaughter, of the accused, throwing rocks at the sign. Mrs. Mattie Pritchard came out of her house and told them to quit throwing at the sign. They thereupon reflected upon the character of Mrs. Pritchard, and she threatened to have them arrested. Mrs. Matt Witham, who was standing with her husband, the accused, and Effie Hoskins, near the old shop, witnessing the affair, said: "Come on and let that old fool alone." The evidence relating to the family quarrel was admitted over

the objection and exception of appellant. When her husband came home after sunset from his work, Mrs. Pritchard informed him of the occurrence. They decided to go down to Mrs. Hoskins' and ascertain why she permitted the girls to abuse Mrs. Pritchard. Deceased had planned to go to the home of George Aiken for the night, to purchase some mules. In going, he would pass by the Hoskins home. Mrs. Pritchard and their son went that far with him. Deceased was unarmed. He took his horses with him. The discussion of the family quarrel resulted in a personal difficulty between Mrs. Pritchard and Mrs. Hoskins. In the midst of the fight, Julia Hoskins ran up the road and hollered, "Oh, Grandpa, come down here with your gun, quick; we have got him." After the altercation subsided, Mrs. Pritchard and her son left deceased standing in the road and went to Sam Newcomb's for the purpose of getting him to induce deceased to go away. While at Newcomb's, they heard a shot, but thought nothing of it. Hampton Pritchard asked Mr. Newcomb for a gun, while at his house. Deceased did not return, and his family concluded he had gone on to George Aiken's, where he intended to spend the night. The next morning, about daylight, Henry and Hampton Pritchard went down the road singing, and discovered their father lying in the road, dead, near the place he was left standing the night before. As they approached, they saw Loy Witham and some other persons going from the place where their father was lying, toward accused's home. Deceased was lying across the road, about thirty yards from the Hoskins gate, between two embankments. The distance between the embankments was seven feet. The embankments were sloping. The embankments were from two and one-half to three feet high, and the ground above them was level for four feet or more back to the fence on either side. There were no evidences on the ground of a struggle. Deceased was killed with a shotgun. The charge entered his breast from the front, ranged downward at an angle of forty degrees, and lodged near the right shoulder blade. Sam Newcomb, who viewed the body and surroundings the

next morning, testified without objection that the party, who shot deceased was necessarily standing upon the embankment. A pool of blood was found about nine yards from the body, in the direction of the Hoskins home. A barlow knife, belonging to deceased, was lying by the pool of blood, open. The handle and blade were both bloody. Deceased's horses were tied to the fence between his body and the Hoskins gate. About 9 o'clock on the night of the tragedy, the accused appeared at the home of his son-in-law, Louis Tudor, three miles distant, and informed him that he had shot the deceased, and expressed the hope that he had not killed him. The next morning the accused met the sheriff within a mile of town, inquired as to the deceased's condition, and surrendered. Loy Witham had accompanied his father to the Tudor home the night before, but was afraid to go back home. Eli Dunnivan went home with him, and they slept together that night. The next morning, they got up and went to the body. They observed the pool of blood near the body, the bloody barlow knife near the blood. The knife was open. Effie Hoskins and her family stayed at the home of the accused that night, and no one went to the place where deceased was killed. Four pictures, taken about three months after the tragedy occurred, were introduced over the objection and exception of appellant. Sam Newcomb, who was present when the pictures were taken, identified and explained them. In explaining them, he said: "Here is one that I don't understand, some way or other." He followed this statement with an explanation of the picture as representing Witham's house. In identifying and explaining the pictures, he said that the first represented Witham's house, the path in front of it and some lumber and stuff lying by the path; the next, the road to Hoskins' in front of his house; the next, the road to Hoskins' house; and the next, the road at Hoskins' house.

The evidence adduced on behalf of appellant is, in substance, as follows: There had been no family quarrel in the afternoon before the killing, nor any difference

between the accused and the deceased prior thereto, except in August, when the deceased came to the accused's home and charged Loy with abusing his wife. On that occasion deceased threatened to kill Loy and others if the abuse did not stop, if he had to get them from the bushes. Grace and Julia had not thrown at the signboard, nor abused Mrs. Pritchard in the presence of the accused, his wife and Mrs. Hoskins. Deceased, his wife and son had come to Mrs. Hoskins' home about 8 o'clock on the night of the killing, and accused the girls of these things. Mrs. Hoskins resented the charge; whereupon Mrs. Pritchard attacked her, and, during the fight, both deceased and his son struck Mrs. Hoskins. Mrs. Hoskins ordered them away. Julia Hoskins ran up the road and called for the accused. Mrs. Pritchard and her son left. Deceased remained and told them to call the accused, for he came to have it out with him, and that he intended to kill him if he came. Deceased tied his horses to the fence near the Hoskins home; then opened and put his knife in his pocket. Loy and Grace came before accused and his wife. Deceased ordered them to stop, and struck at Grace. When accused and his wife arrived, deceased jumped from behind his horse and told accused he had said if they called him down there he would kill him, and with that, grabbed accused. The accused jerked loose and said, "Stop." Deceased grabbed him again, and as he backed off again, cut at him. When deceased had backed him for a way up the embankment and against the fence, accused jerked loose and shot him. Accused raised the gun in both hands and fired one shot, the muzzle being within two feet of deceased's breast. Accused turned and ran before deceased fell. Accused did not return, or send any one, to see about the deceased. When he got home, he removed his sweater, which had been cut in the affray, and, after putting on other clothes, went to Louis Tudor's, in company with his son, where he remained for the night. Mrs. Hoskins and her children went to accused's home a short time after the killing and remained there. They did not go to the body or see it, but went

around another way. Loy went home by the road, and observed the body of the deceased lying in the road, and passed on.

Appellant first insists that the court committed reversible error in giving instructions 1 and 2, because it is said they are abstract. Instuction No. 1 defined murder in the first degree; and No. 2, in the second degree. We do not think either instruction was abstract. There was evidence tending to show that the deceased, while standing in the road below the embankment, was shot by appellant while standing on the level ground above the embankment; that considerable distance intervened between them when the fatal shot was fired. There was no evidence of a struggle between them—the shotgun used being raised and held in both hands by appellant when fired. The range of the charge was downward at an angle of forty degrees. The evidence of the State tended to show that bad blood existed between them. So, it can not be said that evidence is wanting to show a motive for the killing. These stubborn facts, in connection with the subsequent conduct of appellant in abandoning the body of deceased and not returning to it, are inconsistent with a killing in necessary self-defense. If it could be said the instructions were abstract, no prejudice resulted to appellant on account of the court having given them, because he was acquitted of murder in the first and second degrees. This court said, in the case of *Easley* v. *State,* 109 Ark. 134, "As the defendant was only convicted of murder in the second degree, it is plain, whether the instruction on murder in the first degree was erroneous or not, it did him no harm." Again, in the case of *Rogers* v. *State,* 60 Ark. 76, it was said by the court that "where under an indictment for murder, defendant is convicted of manslaughter, error in defining the higher degrees of homicide is not prejudicial to defendant."

Appellant next insists that the court erred in defining malice. It is unnecessary to analyze the instruction, because malice was not an ingredient of the crime of manslaughter, for which appellant was convicted. Mal-

ice was an essential ingredient of the higher degrees of homicide of which appellant was acquitted. Therefore, no prejudice resulted to him on account of the instruction defining malice.

Appellant next insists that the court erred in submitting to the jury the question of whether there was either deliberation or premeditation existing in the mind of appellant at the time of the killing, for the reason, it is said, that no evidence whatever was adduced to show either deliberation or premeditation on his part. Deliberation and premeditation are not elements of the crime of manslaughter for which appellant was convicted, and no prejudice could have resulted to him on account of the instructions submitting those questions.

Appellant next insists that the court committed reversible error in instructing upon the various degrees of homicide, by saying, in effect, that, if they found at- pellant was not guilty of murder in the first degree, they might find him guilty of murder in the second degree, or lesser degrees, if convinced beyond a reasonable doubt of the guilt of any one of the degrees of murder. It is said that this manner of instructing the jury impressed upon their mind that the court wanted the defendant convicted of something. We think this position is untenable, for the court distinctly told the jury that, unless they were convinced beyond a reasonable doubt of the guilt of the accused, then it was their duty to acquit appellant. Certainly, reasonable men could not have concluded that the court wanted appellant convicted of some degree of homicide, when pointedly instructed to acquit him unless they believed, beyond a reasonable doubt, that he was guilty of some degree of homicide.

Appellant next insists that the court erred in giving instruction No. 7, requested by the State, which is as follows: "You are further instructed that in order to justify the defendant in killing the said W. L. Pritchard in self-defense that it was the duty of defendant to employ all means within his power and consistent with his safety to avoid the danger and avert the necessity of

taking the life of the deceased, and that the circumstances were sufficient to excite the fears of a reasonably prudent person that the danger was so urgent and pressing that, in order to save his own life, or to prevent his receiving great bodily injury, the killing of the deceased was necessary, and that the deceased was the assailant." Appellant contends that the undisputed evidence showed that he did all within his power, consistent with his safety, to avoid the danger, and that the danger was so urgent and pressing it was necessary to kill deceased in order to save his own life. It is true appellant testified that he did all within his power, consistent with his safety, to avoid taking deceased's life, and that, at the time he fired the fatal shot, the danger to him was urgent and pressing. Other evidence, however, tended to show that, at the time the fatal shot was fired, quite a little distance intervened between the accused and the deceased; that the accused was standing on level ground above an embankment, and the deceased in the road below the embankment at the time the shot was fired; that deceased had not advanced on appellant up the bank and crowded him backward to the fence before he fired the shot; that, on the contrary, deceased was shot and fell in the road, by appellant, who was standing on the level ground above the embankment. The evidence being in dispute as to whether appellant employed all the means within his power, consistent with his safety, to avoid the danger, and as to whether the danger was so urgent and pressing that it was necessary to kill deceased in order to save appellant's life, it was proper to submit that question to the jury.

It is next insisted that the court erred in admitting evidence relating to the family quarrel at 3 o'clock in the afternoon before the killing. According to the State's witnesses, this quarrel occurred in the presence and hearing of appellant. The evidence, in its nature, tended to establish a motive for the killing, as well as tended to show who was the probable aggressor in the subsequent affray. In the first place, appellant stood charged with

all the degrees of homicide, and evidence tending to establish a motive for the killing was admissible on the charge, and, even if appellant had stood charged with manslaughter, the evidence would have been admissible under appellant's plea of self-defense, as tending to show which was the probable aggressor.

Appellant next insists that it was error to admit the evidence of George Aiken and his wife to the effect that they were on a trade for mules and that he had made arrangements to come to their house on Wednesday to see George Aiken about purchasing them. We think this evidence admissible, as tending to corroborate the evidence of other State witnesses to the effect that the deceased stopped at the Hoskins home on his way to the home of Aiken, and had not gone to the Hoskins home for the purpose of killing or doing bodily harm to appellant.

Appellant insists that the court erred in permitting the introduction of four photographs purporting to represent the place of killing, the road between the Witham and Hoskins places and the two residences, for the alleged reason that the photographs were not properly verified. The rule announced in the case of *Sellers* v. *State,* 91 Ark. 175, is relied upon to support the contention. The case cited is not parallel to the instant case, for in that case the photographs were intended to show the situation of the parties and the place and condition connected with the final rencounter. In the instant case, the photographs were introduced for the purpose of aiding in the description of the place where the rencounter occurred, and the relative position of the two residences referred to in the testimony. The photographs in the instant case could have little bearing upon the issues involved, for they in no way attempt to locate the persons engaged in or witnessing the affray during any period from its inception to its ending. They only evidence the place where the affray occurred, and so it was not as necessary to have the photographs as accurately verified as if they attempted to place the persons and their respective posi-

tions, from time to time, in the scene. But if the rigidity of the rule should be applied, we think it was substantially complied with in the instant case. Sam Newcomb was present when the photographs were taken and verified them all. It is true he said, concerning one of them, "Here is one that I don't understand some way or other." He followed up his testimony, however, by saying: "It represent's Witham's house. In front it shows the path, some lumber and stuff. It is 62 feet from Witham's house to the road in front of his house." It will be seen that, while he had some difficulty in understanding it, he did understand it sufficiently to explain it. No claim is made that the physical conditions had been changed after the killing and before the photographs were taken. We think he sufficiently identified each photograph.

Appellant next insists that the court erred in permitting Mart Kelt to testify, in substance, that, some six years before the killing, he heard accused say he grudged deceased the ownership of the land, and that some day, in some way, he would acquire it himself. This evidence only tended to establish a motive for the killing. Any prejudice resulting from the admission of this evidence was eliminated by appellant's acquittal of murder in either the first or second degree, because motive was not an ingredient of the crime of manslaughter, for which he was convicted, and was a necessary ingredient of the crimes of which he was acquitted.

The next and last insistence of appellant is that the court erred in refusing to allow Matt Witham, who was present at the scene of the killing, to testify on behalf of her husband. This court ruled in the case of *Padgett v. State,* 125 Ark. 471, that act 159 of the Acts of the General Assembly of 1915, extending the rights of married women, did not relate to the rules for the production of evidence; and hence did not change the rule to the effect that the wife is incompetent to testify for or against her husband in criminal cases. It is insisted, however, that act 66 of 1919 of the General Assembly so enlarged

the rights of married women as to relate to and change the rules for the production of evidence. We are unable to discover anything in act 66 of 1919 of the General Assembly which authorized a married woman to testify for or against her husband in criminal cases. It was ruled in the case of *Comstock* v. *Comstock*, 146 Ark. 266, that act 159 of 1915 and act 66 of 1919, changed the status of married women so as to render husband and wife competent as witnesses for or against each other in suits between themselves. There is nothing, however, in the opinion in the case of *Comstock* v. *Comstock, supra,* nor in either statute, changing or modifying the rule for the production of evidence in suits between third parties and either one of them.

No error appearing in the record, the judgment is affirmed.