## Fox v. State.

### Opinion delivered January 15, 1923.

1. BURGLARY—LARCENY—SUFFICIENCY OF EVIDENCE.—In a prosecution for burglary and grand larceny, evidence *held* to sustain a conviction of both charges.

2. CRIMINAL LAW—EVIDENCE—ACTS OF BLOODHOUND.—In a prosecution for burglary and grand larceny committed by breaking into a store and stealing certain merchandise, evidence that bloodhound trailed the burglar from the store to defendant's residence, together with an explanation as to how the dog was trained, *held* sufficient to make the acts of the dog in pursuit of the burglar admissible; its weight being for the jury.

3. CRIMINAL LAW—INSTRUCTIONS ALREADY GIVEN.—Refusal to give instructions fully covered by others given *held* not error.

4. CRIMINAL LAW—DUAL VERDICT—SIGNATURE.—Where, in a prosecution for burglary and grand larceny, a writing on a single sheet finding the defendant guilty of each offense was signed by the foreman at the bottom of the page, this was sufficient compliance with Crawford & Moses' Dig., § 1300, requiring the verdict to be signed by the foreman.

Appeal from Pike Circuit Court; *James S. Steel,* Judge; affirmed.

*W. T. Kidd* and *T. W. Roundtree,* for appellant.

*J. S. Utley,* Attorney General, *Elbert Godwin* and *Wm. T. Hammock,* Assistants, for appellee.

McCULLOCH, C. J.   Appellant was convicted under each count of an indictment charging him with two offenses of burglary and grand larceny, alleged to have been committed by breaking and entering the store of one T. J. Coffman and stealing, taking and carrying away certain property of said Coffman, of the value of thirty dollars.

The conviction rests mainly on proof of circumstances, and it is contended that there is not sufficient proof to support the verdict.

Coffman operated a small merchandise business at the village of New Hope, in Pike County, and appellant was a farmer living about a mile, or a little less, northwest of the store.

The burglary was committed on Saturday night, January 7, 1922, and discovery of the offense was made by Coffman early the next morning.   He testified that when he went to the store early the next morning (Sunday) he found that the store had been broken into and a lot of merchandise, including a sack of flour, a lot of handkerchiefs and stockings and other articles, of the total value of twenty-five or thirty dollars, had been stolen.   He also testified that small change left in the cash-drawer had been stolen, and that it amounted to between two and three dollars.   He stated that the cash-drawer had been overturned and that about fifty cents in pennies and nickels were found scattered on the floor.

Coffman called in the constable of the township to assist in hunting up evidence of the identity of the criminal or criminals, and they discovered a trail of flour on the ground as if a flour sack had been broken and its contents sprinkled along the road.   The road leading towards the house of appellant ran north from the store about half a mile, and another road turned westward at that point, going in the direction of appellant's house.

Coffman, and Reed, the constable, testified that they followed the trail of flour along the road, and observed fresh tracks, the trail finally leading off through a field

in the direction of appellant's house. After following the trail for a distance, Coffman and Reed sent for a man in the neighborhood who owned what they termed a bloodhound—a dog trained and qualified to follow the human trail. They testified that in following the trail up the road they kept out of the road and walked along the roadside so as not to interfere with the dog following the trail, and they also stationed men at each end of the road so as to block it and prevent any traveling along the road until the dog should arrive.

The man with the dog came, and the dog was carried into the store where the burglary had been committed, and hunted all around the store, but was disposed to return again and again to the cash drawer. The dog then left the store and followed the trail northward along the public road where the flour was sprinkled. The dog trailed into appellant's field, and, after "maneuvering around," as expressed by the witnesses, he turned towards appellant's house, and as he trailed along, approaching the garden fence where two paling were missing, appellant came out of the house and told the man to stop the dog, that there was no need to follow him further, as he and one Cornelius Lafever had passed through there the afternoon or evening before, and that it was his track the dog was trailing. The owner of the dog then stopped the dog, and there was nothing further done, except that the dog later took another trail and went towards the north.

It is further shown in the testimony that Cornelius Lafever, who is conceded to have been connected with the burglary, left the house early that morning and went northward, carrying with him the stolen goods, or at least a portion of them.

The house was searched by Coffman and an officer, with appellant's consent, but none of the stolen merchandise was found, except that there was found 86 pounds of flour, by actual weight, in appellant's bin in the kitchen.

Appellant, when questioned, denied that he knew anything about the burglary, but stated that he had been out with Cornelius Lafever that night until about two o'clock.

Coffman testified that he observed appellant's children chewing gum, and that he asked appellant where the children got the gum, and appellant replied that he did not know. Coffman testified that a lot of chewing gum was taken by the burglar the night before.

Appellant was related to Lafever, having married the latter's niece.

Appellant testified that on the night of the burglary he and Lafever left home together about eight o'clock and went over to the house of a neighbor, one Cornish, and remained until about two o'clock, Lafever furnishing the whiskey for the occasion, and Cornish furnishing music on his violin. Appellant testified that he and Lafever returned to his (appellant's) house about two o'clock, and that, after building up a fire and remaining there awhile, he went to bed, and that Lafever left the house, and returned in about an hour, bringing into the house a tow-sack which had merchandise in it. He testified further that Lafever, after remaining there awhile, made another trip and again returned, and remained at the house until after daylight. He stated that Lafever told him that he had stolen the merchandise from a store at New Hope, and that he told Lafever that he must remove the stuff from the house, which was done. He gave as his reason for not disclosing this information to Coffman and the officer that he did not feel it was his duty to relate it until he did so from the witness stand.

Appellant undertook to account for the quantity of flour in his bin by saying that he had recently bought two forty-eight pound sacks of flour, one of which was bought on the afternoon before the burglary was committed. The State introduced other testimony, however, tending to show that one of the sacks of flour bought by appellant had been thrown from a mule on which appel-

lant was riding, and that more than half the flour was lost on the ground.

It is therefore seen that it is undisputed that Lafever entered the store of Coffman, stole the merchandise in question and carried it to appellant's house, and that the dog followed the trail. The only real issue in the case is whether or not appellant was a participant in the crime and was present at its commission.

We are of the opinion that the circumstances warranted the jury in finding that appellant was present at the commission of the crime and participated therein. In other words, the jury were justified in finding that appellant and Cornelius Lafever were the burglars who entered Coffman's store and stole the merchandise. The tracks showed that there were two men who participated in the commission of the crime, and the tracks led to appellant's house. The various circumstances, including appellant's contradictory statements, indicate a guilty knowledge on his part of the crime and warranted the inference that he participated. The evidence warranted the jury in finding that a portion of the stolen flour was in appellant's possession, and this was sufficient to authorize the inference that he had stolen the flour. This issue was submitted to the jury upon explicit instructions on the subject, and we think the evidence was sufficient to support the verdict.

It is next contended that the court erred in admitting testimony concerning the activities of the hound brought to the scene for the purpose of trailing the burglar. Titus Measles, the owner of the dog, was introduced as a witness, and he testified that the dog was about eleven months old, that he had put the dog through a course of training so as to train him to follow the human trail, and that the dog had, in fact, under his supervision, trailed four criminals who had committed burglaries on other occasions. On cross-examination he testified that he usually practiced the dog in trailing at least twice a week, and that, in addition to this, neighbors

would generally come to his house on Sunday out of curiosity, and that in conjunction with his neighbors he would put in considerable time practicing the dog. He explained to the jury how he conducted the training of the dog, and stated that he had never known the dog to fail but once to find the man sought, and that on that occasion the man had climbed a tree, and that the dog followed the trail to the tree but did not locate the man up the tree. This, he said, was when training the dog, and not upon the occasions mentioned when the dog trailed criminals. The witness was asked the direct question whether or not the dog was a bloodhound, and he answered, in substance, that he did not know the pedigree of the dog, but that so-called bloodhounds had long ears, and that this dog had that kind of ears. He said that the dog was not an ordinary hound, and that he had had no trouble in training him to follow the human trail.

We are of the opinion that there was enough testimony to justify the court in submitting the question of the dog's activities to the jury. The weight of the testimony was one for the jury. This subject has been discussed in many of our previous decisions. *Holub* v. *State,* 116 Ark. 227; *Padgett* v. *State,* 125 Ark. 471; *Cranford* v. *State,* 130 Ark. 101; *West* v. *State,* 150 Ark. 555.

Besides, the testimony concerning the actions of the dog added little, if anything, to the State's case against appellant, for it is undisputed that stolen property was carried from Coffman's store to appellant's home along the route followed by the dog, which was indicated by the trail of the flour.

Several of the instructions requested by appellant's counsel were refused by the court, and those rulings are assigned as error. We find, however, that the refused instructions related to the question of reasonable doubt, and that they were fully covered by other instructions, some of which were given at the instance of appellant's counsel.

Finally, it is contended that the verdict was not in sufficient form and was not signed by the foreman.

The jury brought in two verdicts, written on the same sheet, signed by the foreman at the bottom. One read: "We, the jury, find the defendant guilty of burglary, and assess his punishment at two years in the penitentiary;" and the other read: "We, the jury, find the defendant guilty of grand larceny, and assess his punishment at one year in the penitentiary." The statute (Crawford & Moses' Digest, § 1300) requires that the verdict of a jury must be signed by the foreman, and we think that the statute was complied with in this instance. The fact that the two verdicts were written on the same paper and signed at the bottom by the foreman shows that the signature was intended to be appended to both of the verdicts. The objection goes merely to form and is not well founded, since it appears with certainty that the intention was to return both verdicts under the signature.

Finding no error in the record, the judgment is affirmed.

SMITH, J. (dissenting). This court has, in the cases cited in the majority opinion, upheld the admission of testimony showing the trailing of human beings by bloodhounds as a circumstance tending to prove that the person trailed had recently been at the scene of the crime. But in all those cases it was said that the preliminary showing must first be made, and had been made, that the dogs were of pure blood and had been properly trained. The majority opinion still recognizes the necessity for this preliminary proof, but, in my opinion, has not required that the conditions be met which the rule requires before admitting the testimony.

The first case in which we upheld the admission of bloodhound testimony was that of *Holub* v. *State,* 116 Ark. 227. In so doing we followed the Court of Appeals of Kentucky, and referred to the case of *Pedigo* v. *Commonweath* (103 Ky. 41, 42 L. R. A. 432, 82 Am. St. Reps.

566, 44 S. W. 143), for a discussion of the conditions under which testimony of that character would be admitted at all. The Kentucky case appears to have been the second case in which such testimony was held admissible, the majority opinion reciting the fact that *Hodge* v. *State,* 98 Ala. 10, appeared to be the only case on the subject. Since then this State and a number of others, chiefly Southern States, have followed the Kentucky case, but, in so doing, have always required a preliminary showing of the dog's qualification. In that case it was held that testimony as to trailing an alleged criminal by a bloodhound may be permitted to go to the jury as tending to connect him with the crime only when there is testimony of some person who has personal knowledge of the fact that the dog used has an acuteness of scent and power of discrimination which have been tested in tracking human beings, and it is not sufficient to show that the dog is of pure blood and of a stock characterized by those qualities. It was there also held that the showing must be made that the persons placing the dogs on the trail were skilled in the performance of that service.

In my opinion it is a long step from the admission of dog testimony under the limitations prescribed in the Kentucky case to the admission of testimony showing the conduct of Titus Measle's hound pup.

There are States in which the admission of dog testimony is wholly excluded, upon the theory that neither court nor jury can have any means of knowing why the dog does this thing, or another, in following in one direction, instead of in another, as this is left to the dog's instinct, without knowledge by court or jury upon what it was based, and that the conclusions of the bloodhound are too unreliable to be accepted in evidence in either civil or criminal cases. The view of the courts so holding is unaltered by any consideration of testimony showing the breeding of the dog, or the thoroughness of its training, or the skill in his handling.

We have held otherwise in the cases cited in the majority opinion, and I do not inveigh against those cases; but I do protest against the relaxation of the safeguards against the admission of this testimony which all the courts that admit testimony of this character at all require.

The necessity for caution along this line is pointed out in an article entitled "The Bloodhound as a Witness" in vol. 54 American Law Review, p. 109. This article was written by a lawyer who had given special study not only to the law of the question but to the characteristics of the dog itself. He shows in this article that the original blooded hound, famed for its power of scent, was a small affectionate dog found in England in the earliest days, and was much used as a pet and a house-dog. On account of its slow and plodding nature it was crossed with the fox terrier, producing a strain of hounds called fox-hounds. This dog still lacked ferocity, a quality thought necessary for trailing slaves, and it was crossed with the Great Dane or the Cuban Mastiff, both savage and vicious breeds of dogs, and the bloodhounds of today with the longest pedigrees go back to this crossing.

Returning to the Kentucky case of *Pedigo* v. *Commonwealth,* which we followed in upholding the admission of dog testimony, it may be said that the fears expressed in the dissenting opinion in that case as to the consequence of the holding of the majority have been realized in the holding of the majority in the instant case. In this dissenting opinion it was there said: "The use of bloodhounds was, perhaps, necessary to efficiently and effectually uphold the institution of slavery, as well as to aid in the arrest and capture of persons accused of crime in the Dark Ages. In such cases, however, the object sought was the arrest or capture of known fugitives. If the dog, in fact, took up and followed the trail of a fugitive, and found him, or aided his pursuers to find him, the object was accomplished, and there could be no

mistake as to whether he was the party sought or not; his guilt and right of capture having been theretofore established, and in fact being unquestioned. * * * It is now proposed to use the hound, not to capture a fugitive, but to ascertain or furnish evidence to convict some citizen of crime. * * * There is danger that the effect of the majority opinion will likely be to greatly promote the raising and training of bloodhounds, or hounds that will be called bloodhounds. It is a well-known fact that the owners of hounds, as well as other property, usually hold such property in high esteem; and, as the owner or trainer of hounds will be engaged in the business for pay, it will be greatly to their interest to always have well-trained hounds. In fact, I presume there will be none but trained and expert hounds in a few years; at least such will be the opinion of their owners, for it would be utterly useless to have any other sort."

The qualification of Measle's dog was proved by Titus himself. He had trained the dog, but had trained no other dog. The dog was given his training by Titus while Titus was acquiring his skill in training dogs by training this dog.

The pup was about eleven months old, and Titus testified that he did not know whether he had a pedigree or not, but expressed the opinion that he was a bloodhound because he had long ears. Titus was asked: "Do you know whether he was a full bloodhound or not?" and answered, "I never saw his blood, and I couldn't tell you."

Mr. Coffman testified that when he turned the dog into the store "the dog smelled in and around on each side of the counter, but had put in more time, it seemed, around the money-drawer." This was, of course, perfectly natural, as any bloodhound worthy of the name would reasonably expect the burglar to go to the cash-drawer, and then, to prevent any possibility of mistake on the dog's part, the officers closed the public road upon

which they expected the burglar to be trailed to all travel until the dog's arrival.

As I read this testimony, it is obvious that the dog wholly lost the trail—if it ever had it—about 250 yards from appellant's house. Here is where the dog did his maneuvering. Titus did not deny that the dog got off the trail and went on beyond appellant's house, but he testified that the dog got off the trail after appellant had appeared on the scene and admitted that he had hunted birds in the field where the dog then was. After reaching appellant's house Titus tied up his dog, and the party accompanying the dog searched the house and found more than one sack of flour in the bin and the children chewing gum, but the searchers did not find the torn flour sack nor anything which could be identified by Mr. Coffman as having been taken from his store. And, *mirabile dictu,* Titus testified that, after he had pulled the dog off the trail, and after the party had left appellant's house, the dog then wanted to trail from there in the direction of Cornelius Lafevre's house.

The fact of the matter is, as every boy learns, when he gets his first dog, that a dog will trail; indeed, the trouble is he trails overmuch. He trails one thing awhile, and then something else, if a fresher and more interesting trail is come upon. Here is where the necessity for blood and training comes in. The dog must be taught to keep his mind on his business, to concentrate upon the task to which his trainer puts him. This requires skill upon the part of both dog and its trainer, and, unless the qualifying testimony shows that the dog had been previously properly trained, and was skilfully handled when put upon the trail, the evidence of the dog's conduct is as valueless as the responses of a Ouija board.

In my opinion, the testimony does not show that Titus Measle's dog had been properly trained, and the testimony in regard to his conduct should not have been admitted.

Mr. Justice HART concurs in the views here expressed.