## Elgin MARTIN *v.* STATE of Arkansas

5455                                        451 S. W. 2d 453

Opinion delivered March 9, 1970

[Rehearing denied April 13, 1970.]

*Thomas L. Cashion,* for appellant.

*Joe Purcell,* Attorney General; *Don Langston,* Asst. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. Elgin Martin was charged with the murder of his son, James Guice Martin, the killing occurring on December 8, 1968. On trial, Martin was convicted of voluntary manslaughter, and sentenced to three years imprisonment in the State Penitentiary. From the judgment so entered, appellant brings this appeal. For reversal, it is urged that the testimony was insufficient to sustain a conviction, and that the court erred in permitting the state to introduce alleged threats of Martin toward his son, the first, occurring 10 years before the homicide, and the second, occurring about 9 months before this event.

The evidence reflects that, on Sunday evening, December 8, 1968, James Guice Martin and an occasional employee, James Lewis, were at Martin's shop, located 4 or 5 miles from Wilmar. Late Sunday afternoon appellant went to the shop to see about borrowing young

Martin's tractor to pull a dead mule away from the older man's premises. The elder Martin asked if he could use the tractor, and was told that he could. Guice and Lewis then went back to Wilmar, Lewis getting out at the washateria. Lewis testified that there were no angry words between the Martins before leaving, but that on the way back to town, Guice Martin said that he was going back and "get things straight." Appellant testified that, after his son told him he could use the tractor, he left, and walked back to his home, about 500 or 600 yards from the shop, to feed his dogs. While he was so engaged, Guice drove up in his truck, got out, and said, "I've got a little deal for you. You've been lying to me long enough about that tractor." He said that the son cursed him, grabbed him by the coat, jerked him around, and said, "You stand up here, I'm going to do the talking and you're going to do the listening." According to appellant, he was then hit in the mouth and knocked down. He further stated that Guice then said, "I'm going to finish you once and for all," and started back to his truck. It was dark and appellant testified that he (appellant) then ran to his own truck, obtained a shotgun, and "squatted down. He stood there with his flashlight hunting me." Martin said that he ran east for a short distance, then north over to a road, through another field, and stopped in a lane, traveling in all about a quarter of a mile. "Just as I stopped a flashlight came on behind me. It was on and off. I just wheeled around and shot." The shot was fired with a 12-gauge automatic shotgun, loaded with No. 6 shot. According to officers who shortly thereafter investigated the shooting, Guice was shot in the face and chest, and was lying on his back with a flashlight beside his left hand. The light was not on. There was no evidence of a struggle, and no weapon was found. The testimony reflected that the shot was fired at a distance of about 30 feet, and one of the officers testified that the deceased was struck by at least 150 No. 6 shot, though only one shell was fired. A written statement was subsequently given by Martin to the officers.[1]

---

[1]Testimony reflected that appellant was advised of his constitutional

Appellant stated that, after his son struck him, and started back toward the truck, he (appellant) thought that Guice was going after a gun, "because he always carried a gun in his truck." Appellant's testimony and the statement first made to the officers, differed in one important respect, *viz.*, in the statement, appellant said that, when he fired the shotgun, he did not know who was flashing the light. On trial, he testified that he knew Guice was the person with the flashlight. After the shooting, appellant did not investigate to see whether he had hit the son, but instead, went to his daughter's home, and no one being present, went about two miles to the home of Dale Avery, and told Avery and his wife that he thought he had shot Guice, but "Go see if I hit him or not."

Of course, there were no witnesses to the shooting, other than appellant himself, but there was certainly evidence to clearly indicate to the jury that the shooting was unnecessary, and not done in self-defense. In the first place, it was established that Guice Martin was not armed, for there was no weapon by the body when the officers arrived on the scene. A search of Guice Martin's home revealed that the three guns that he owned were all in the house, and there was no gun in his truck. In fact, it was clear from the testimony of appellant himself that he was the only one who endeavored to obtain a weapon. Appellant said that he started to get his knive out of his pocket, and that was when he was struck by Guice. "This had happened before, I had bluffed him before with my knife and I was going to try to do it again." Admittedly, he did not warn his son that he had the gun and not to come closer, and when asked why he didn't shoot the son in the legs, instead of the face, replied, "I just shot. I didn't even know it was on him. I just shot to scare him to get on out of the way." Appellant himself earlier testified, "I just feel like it shouldn't have ever happened, wasn't no use of it." The testimony was ample to sustain the conviction, and, in fact, coupled

rights, and signed a waiver, and there is no contention here that the statement was not voluntarily given.

with evidence of threats, hereinafter discussed, would have sustained the charge of murder.

As to the second point, Robert H. Martin, 27 years of age, son of appellant and brother of the deceased, testified that, in 1958, when he was 16 or 17 years of age, and Guice was 23 or 24, he heard his father threaten to kill Guice in Wilmar while they were standing in front of the bank:

"Well, he was behind on the alimony and we walked up to him and Guice asked him did he have any money for mother. He said, 'You want it, you come get it,' and pulled his knife."

He stated that nothing further happened, and he and Guice went on about their business.

Creola Reynolds, 32 years of age, daughter of Elgin Martin and sister of the deceased, married, and with two daughters, testified that she lived about 400 yards from her father, and that he had visited with her and eaten supper in her home many times. When asked if appellant was having any trouble with Guice, she replied, "As far as I knew, everything was OK at times." She stated, however, that, about 9 or 10 months before the killing, while in her home, he said, "If that s—-of-a-b—— ever lays a hand on me, I'll kill him." When asked if she thought he was serious, she replied:

"I didn't know. In my own feeling, the way I felt, in a way I did. I'd get nervous, because I've heard that threatening remark many many times."

The daughter also testified that she was present on the occasion of an argument relating to her father's agreement to give Guice 11 or 12 acres of his land located near the younger Martin's shop.[2] Her brother was

---

[2]The deed, sometime subsequent thereto, was executed.

getting ready to leave for a job away from home, and he wanted to get the deed before he left:

"I was picking strawberries, me and my children. Guice came up and asked him would he have maybe 30 minutes time that morning, being that it had rained and the ground was wet, to go sign and have the papers notarized. He had everything fixed to have them signed and notarized that next morning. He was going to come pick him up and bring him to have them notarized and carry him back. He said, 'You won't lose over 30 minutes work.' He told him, 'Hell no, I don't have time.' That's all I heard."

She testified, however, that in the early part of November, at the beginning of the first deer season, her father, Guice, and a man named Mercer were up at the shop engaged in target practice with Guice's gun, all firing the gun, and it "looked like everything was just as calm and peaceful as could be." She also said that, after the death of one of the brothers who was apparently close to his father (and had been killed in an accident), the children told him they would help him as best they could.[3]

Cade Reynolds, husband of Creola, corroborated the testimony of his wife, relative to appellant's threat to kill Guice; he also said that Martin added that he should have done it a long time ago.

Martin admitted the altercation with his son in Wilmar in 1958, stating that Guice had walked up and "said he was going to beat hell out of me," and that he (appellant) had reached in his pocket to get his knife, and told Guice to go on, as he didn't want any trouble. He also admitted the argument with Guice about fixing up the deed, but denied making the threat testified to by Mr. and Mrs. Reynolds.

Appellant argues that the court erred in admitting

---

[3]Appellant also testified that, when this son was killed, Guice and Robert went to the brother's home, asked him to come outside, and said, "What's done happened, let it be happened, we're going to be better from now on."

the testimony about the threats, and he relies on our case of *Billings* v. *State,* 52 Ark. 303, 12 S. W. 574. There, the widow of the deceased was permitted to detail the particulars of a difficulty between the deceased and the killer about 2½ years prior to the killing, and was further permitted to testify about a conversation with appellant 2 years before. These facts are set out in the opinion, as follows:

"* * * Her testimony was substantially, that at a picnic her husband and one Wilson had a fight; that a few moments after the fight her husband said to one Bostic that he had knocked his brother-in-law, meaning Bostic, down. That appellant, who heard the remark, ran up with a drawn knife, and said, 'If it's brothers-in-law you are after, I am here,' coupled with curses and oaths, at the same time striking at him with the knife. As to the conversation of the appellant with her, she testified, that he wanted to buy her interest in their father's estate. That she offered to sell for cash, which he could not pay; that she refused to sell on credit. That he then said he would have the land or some man's hide."

Billings was convicted of manslaughter, and this court reversed because of the admission of this testimony, stating, *inter alia* that the conversation of appellant with Mrs. Wallace was ambiguous, if not appearing to whom he intended his threat to apply, and that in view of all the facts, including lapse of time, and no recurring trouble, the testimony was inadmissible. The court specifically stated that it is impossible to say how far back, with respect to time, such testimony would be admissible. A strong argument can be made that the testimony of the threat made 9 or 10 months before the homicide was admissible, and even that the threat 10 years before was admissible, these occurrences tending to show malice. It will be recalled that appellant, in reaching for his knife on the night that he killed the son, mentioned that he had "bluffed" young Martin before with the knife, this apparently

being a reference to the occurrence 10 years before.[4]

Likewise, the daughter, in testifying about the threat made to kill Guice, said, "I've heard that threatening remark many many times." Her husband also testified that the father, in threatening to kill Guice, had said that he should have done it a long time ago. It thus appears that, throughout the 10-year period, there may have well been a feeling of animosity on the part of appellant toward this son. However, we need not pass upon this evidence for the reason that it is not deemed prejudicial under the verdict reached by the jury. In *Witham* v. *State,* 149 Ark. 324, 232 S. W. 437, in rejecting the argument here advanced, this court stated:

"Appellant next insists that the court erred in permitting Mart Kelt to testify, in substance, that, some six years before the killing, he heard accused say he grudged deceased the ownership of the land, and that some day, in some way, he would acquire it himself. This evidence only tended to establish a motive for the killing. Any prejudice resulting from the admission of this evidence was eliminated by appellant's acquittal of murder in either the first or second degree, because motive was not an ingredient of the crime of manslaughter, for which he was convicted, and was a necessary ingredient of the crimes of which he was acquitted."

Of course, Billings was also convicted of manslaughter, but it is obvious that the threats made in this instance were specific, and somewhat repetitious, a fact not true in *Billings.* However, even if the cases are considered as being in total conflict, we might point out that *Billings* was handed down in 1889, while the opinion in *Witham* was rendered in 1921. Aside from that, the last holding seems much more logical, and we think the quoted language is *apropos* in the present case. After all, it could hardly be argued that the jury dem-

---

[4]If not a reference to that occasion, then yet another time, the two had had trouble.

onstrated passion or prejudice in giving appellant a sentence of three years for killing his son.

We find no reversible error.

Affirmed.