## 12123.　TROUP *v.* THE STATE.

1. There was no error in admitting the evidence as to trailing by blood-hounds, of which complaint is made in the 4th ground of the motion for a new trial.
2. (*a*) There was ample evidence to authorize the court to charge the jury in regard to evidence as to the actions and conduct of a certain dog, as complained of in the 5th ground of the motion for a new trial.
   (*b*) "A correct statement of law embraced in a charge to the jury is not erroneous because the court failed in the same connection to give to the jury other appropriate instructions."
3. That portion of the charge excepted to in ground 6 of the motion for a new trial, as to what is necessary to constitute the offense of assault with intent to murder, is not erroneous for either of the reasons urged against it.
4. The judge did not err in failing "to give in charge to the jury the law regarding the offense of unlawfully shooting at another, as defined in § 115 of the Penal Code."
5. The evidence supports the verdict.

DECIDED APRIL 13, 1921.

Conviction of assault with intent to murder; from Irwin superior court — Judge Eve. November 26, 1920.

*Philip Newbern, H. E. Oxford,* for plaintiff in error.

*R. S. Foy, solicitor-general, A. J. & J. C. McDonald, Quincey & Rice,* contra.

BLOODWORTH, J. An indictment was returned against plaintiff in error for an assault with intent to murder C. W. Queen by shooting him with a gun. The evidence of Queen shows that he had been away from home the day that he was shot; that he returned between sundown and dark, took his mule from the buggy, watered him, and, as he was about to enter his lot, was shot. Up to the time of the shooting he had neither seen nor heard any one, but he swore that just after being shot he saw the defendant standing near him with a gun, and told him: "You have shot me. You have killed me." A verdict of guilty was rendered, a motion for a new trial was overruled, and the defendant excepted.

1. Complaint is made that the following evidence of W. E. Tyler was illegally admitted: " I went to the home of Mr. Queen when he was shot; I took a full-blooded bloodhound. This dog I carried with me to Mr. Queen's I had had about four years; I had raised him from a puppy. He had had experience in tracing human beings pretty regular for four years, off and on. I had been constantly trying him and training him most of the time. I have never

known him to leave one track and take up another; after he got
on good he would stick to the track. . . My opinion is based
on the fact that he is trustworthy in the matter of trailing human
beings. I got over there about eight or nine o'clock. I went on
to the house the first thing and got information as to where Mr.
Queen said the party stood who shot him. I then went back with
the dog and kind of circled around and around where the shooting
happened. It was in the corner of the field. I had the dog there.
The dog run pretty close to Mr. Troup's house; he was running and
barking right up to Troup's yard. . . We got to Troup's
house about ten o'clock, after the dog ran the track over there.
When the dog ran over towards Troup's I could not tell exactly
whether he went through the field or towards the branch, because
he got off a piece from us; he got off a piece from where they said
the shooting happened, and went on through the branch and
towards the house. . . I could not say how far it was from
the spot where the man stood that the dog struck the trail; *it
could not have been over three hundred* yards; . . it is claim-
ed that the man stood in the field at the edge of the barn. The
dog was opposite the place where they claimed the shooting hap-
pened, I guess about 300 yards. I did not see the dog; it was
dark. He did not strike the trail at the place where they said
the shooting occurred. I could not swear to this jury that it was
the man's track that stood at the barn and did the shooting that
the dog struck 300 yards away. I kept pretty close to the dog,
myself, Archie, and Wyatt; and I think Hansell Kelley was along;
there were several around there that went with the dog. The dog
ran down the side of the branch awhile and then turned across
the field; I think he did run in the branch some. When he stop-
ped I was pretty close to the house, close enough to see it, in sight
of it. I did not see the dog when he stopped; don't know exactly
right where he was; he trailed up to Troup's yard or right back of
it; we got there about the time the dog did. He did not trail on
into the yard because there had been several tracks there. When
he stopped the trail he was pretty close to the yard fence. It was a
dark night. I think I know there was not any moon at that time.
I don't know whether the dog stopped himself or some one stopped
him. The dog went into the house with us. After we left the
house and came out he struck another track; it seems to me that

it was to the right after we left Troup's house. I do not remember how far he ran that track. We took Tom and he went with us, and I believe that the dog came back to us. . . I said that this was a pure-blooded hound. I know that because my brother has a pedigree to it, his grandmother and grand-daddy. I only know from what my brother told me about it. When we first got there I believe that we struck somebody's track before he went into the field; he struck a track in the road. I think that road came by the lot and on up to the house where Mr. Queen lived; they claimed that it was just a few steps from this road that the shooting occurred. I did not talk with Queen that night after the dog started the track. . . . We did not adopt Troup's suggestion of placing the hound at another point for the purpose of picking up the trail. As to the hound stopping or trying to go on at that place, they stopped and went in the house with us. This dog had the markings of a bloodhound; that is what I call a bloodhound. When we got to the fence he went hunting around a piece, and then opened up. He struck a trail about 300 yards off, that is when he opened up and went to barking. All dogs will do that,— that is, smell around whether or not any one has been there. I believe that I could swear that he smelled tracks about where the shooting occurred. I would not swear that the track he smelled there was the one he started to barking on. . . He resembled a blood-hound; he was marked up like one, long ears and black and tan; he was supposed to be one. All are not black and tan; I meant he was colored like a black and tan stock of bloodhounds; that is what I referred to when I talked about markings. I had had him about four years. I testified this morning that all I knew about his pedigree was what my brother told me. . . All he had run since I had owned him was perhaps he had long ears like a bloodhound and run persons like one, and was marked like one. My brother is warden at Fitzgerald. I think I saw his pedigree before I got him. My brother did not raise the sire and grandsire of this dog; he came from somewhere in Arkansas. He had both of them and he stated to me that this dog was a bloodhound."

When the foregoing evidence is considered in connection with all the evidence relative to the bloodhound, and especially the evidence of A. L. Tucker, its admission was not error over the objections that "no sufficient foundation was laid to authorize the in-

troduction and consideration of said evidence by the jury," and
" because the knowledge of the witness W. E. Tyler as to the pedi-
gree of the alleged bloodhound or track-dog was all hearsay, ob-
tained from what his brother said about the dog." A. L. Tucker
swore: "Wyatt, I think, talked with Mr. Queen about where the
man stood that shot him, and he told him the crib out there; it
was at the far corner of the fence, next the branch, I guess 150
yards may be, and going along there the dog struck a trail, coming
back to the road from the far corner of the fence. We did not
bring him up to the lot, never did stop him; that was 50 or 75
yards from the lot. As soon as he struck the trail he went over
in the direction of Tom Troup's house, he went down the creek,
and, as he went past, the track became clearer, and he ran that way
until we got to Troup's house. The dog never did go as freely
after he left the creek. We kind of overtaken the dog, he kind of
slowed up. Apparently he had lost the trail. The track seemed
to run more clear after he left the creek, I don't think the dog
got any nearer than 50 or 75 yards from Troup's house. He
stopped barking there, just trotted around and we all went in the
house and got Troup." As relating to this evidence regarding the
track-dog and his actions and conduct, the judge charged the jury
fully as hereinafter shown.

2. The judge charged the jury as follows: " The State has pre-
sented for your consideration certain testimony concerning the
presence and actions or conduct of a certain dog, alleged to have
been taken shortly after the time at which the shooting took place,
to the scene thereof. Before you would be authorized to consider
any evidence as to the alleged actions or conduct of the dog, you
must find, from the evidence before you, and a due consideration
of all the surroundings as they appear from such evidence, that the
dog used on such occasion testified about was accurate, certain,
and reliable in following the trail of human footsteps. If you find
from the evidence that the dog was thus accurate, certain, and
reliable, of proper breed and training, and you further find that
the circumstances surrounding the dog, at the time it was claimed
he was made use of, were favorable for certain, accurate, and re-
liable work on his part and the exercise of his peculiar faculty,
if you find that he possessed it, then you may consider all of the
evidence concerning the actions and conduct of the dog on the

occasion testified about, together with all the other evidence in the case, as a circumstance in determining the guilt or innocence of the defendant, giving it just such weight as you, as honest jurors, think it entitled to." This charge was alleged to be error for two reasons: (a) "The evidence relative to the conduct of the alleged track-dog was insufficient to directly or even remotely connect defendant with the perpetration of the crime charged in the bill of indictment, under which defendant was tried." This contention is without merit. There was ample evidence to authorize the charge. (b) Because the court did not, in connection with the above-quoted charge or elsewhere, instruct the jury "that the evidence relative to the conduct of the track-dog, being circumstantial in its nature, was not sufficient, when considered alone, to justify them in returning a verdict of guilt against the defendant."

This excerpt from the charge states a correct proposition of law. See, in this connection, *Fite* v. *State,* 16 *Ga. App.* 22(4) (54 S. E. 485) ; *Harris* v. *State,* 17 *Ga. App.* 723 (88 S. E. 121). And it has been frequently ruled by this court and the Supreme Court that " a correct statement of law embraced in a charge to the jury is not erroneous because the court failed in the same connection to give to the jury other appropriate instructions." *Jones* v. *State,* 24 *Ga. App.* 129(3) (99 S. E. 893), and citations; *Johnson* v. *State,* 24 *Ga. App.* 146(2) (100 S. E. 235), and citations.

3. The judge charged the jury as follows: "You will understand from these instructions that, in order to constitute the offense of assault with intent to murder, there must have existed in the mind of the person making the assault, at the time of the making of such assault, a well-defined and specific intent to kill the person assaulted, and that the alleged assault was committed with a weapon likely to produce death in the manner used. It must further appear that there existed, in the mind of the person making the assault, malice, either express or implied. I have already defined for you express malice and implied malice." This portion of the charge is excepted to, not as erroneous within itself, but because the judge did not give in connection therewith certain other propositions of law. The cases cited above show that this is not a good exception.

4. Error is alleged in the failure of the judge " to give in charge to the jury the law regarding the offense of unlawfully shooting at

another, as defined in § 115 of the Penal Code of this State." The indictment charges the defendant with assault with intent to murder by shooting with a gun, and the evidence showed that the gun was loaded with buckshot. The evidence for the State, if credible, unequivocally demanded a verdict of guilty, and this evidence was met by the statement of the defendant and by evidence which, if true, established an alibi. It was therefore not erroneous for the judge to fail to charge § 115 of the Penal Code of 1910. *Kendrick* v. *State,* 113 *Ga.* 759 (39 S. E. 286); *Tyre* v. *State,* 112 *Ga.* 224(1) (37 S. E. 374).

5. No error of law is shown, and " there being evidence to sustain the verdict, this court can not disturb the finding of the jury by overruling the refusal of the trial judge to grant a new trial upon the ground that the verdict was contrary to evidence or without evidence to support it." *Callaway* v. *Pearson,* 21 *Ga. App.* 565(4) (94 S. E. 817), and cases therein cited.

*Judgment affirmed. Broyles, C. J., and Luke, J., concur.*