STATE OF IOWA, Appellee, v. NICK GRBA, Appellant.

**HOMICIDE:** **Murder—Circumstantial Evidence.** Circumstantial evi-
1  dence reviewed, and held sufficient to sustain a verdict of guilty.

**WITNESSES:** **Impeachment—Collateral Issues.** Witnesses may not be
2  impeached on collateral issues, and especially when no foundation has been laid therefor.

**CRIMINAL LAW:** **Instructions—Patent Fact.** A jury need not be
3  specifically informed of a fact patent to it, i. e., that the entire evidence in a cause is circumstantial.

CRIMINAL LAW: Admissions—Cautionary Instructions. The prin-
4 ciple that "admissions" are unreliable and should be covered by
a cautionary instruction has no application to admissions delib-
erately and understandingly made.

HOMICIDE: Degrees of Offense—Deliberate and Premeditated Acts.
5 The court need submit only murder in the first degree, on a record
conclusively showing the deliberate placing of a high explosive
so as to cause a homicide.

CRIMINAL LAW: Evidence—Conduct of Bloodhound. Evidence of
6 the conduct of a bloodhound in tracking a human being is inad-
missible against the accused in a criminal cause.

DE GRAFF, J., dissents.

*Appeal from Cerro Gordo District Court.*—C. H. KELLEY, Judge.

JUNE 22, 1923.

THE defendant was indicted for the crime of murder in
the first degree, and entered a plea of not guilty, and upon trial,
was convicted and sentenced to life imprisonment.—*Reversed.*

*J. E. Williams* and *Duncan Rule,* for appellant.

*Ben J. Gibson,* Attorney-general, *Maxwell A. O'Brien,*
Assistant Attorney-general, *L. R. Boomhower, Ralph Stanberry,*
and *John A. Senneff,* for appellee.

FAVILLE, J.—Mike Baldizer was a taxi driver, living in a
suburb of Mason City. He was a native of Austria-Hungary,
and had been in this country about ten years. His wife was
of the same nationality, and she and Baldizer were acquainted
while in Europe. She came to this country about three months
after her husband, and they were married here. The Baldizer
home was located about a quarter of a mile west of the main
plant of the Lehigh Portland Cement Company. It was one
of a group of cottages which are referred to as the "Lehigh
Cottages." The Baldizer cottage was located on the south
side of a street that runs east and west. This street terminates
about 100 feet west of the Baldizer cottage, and at the end of
the street is located a garage which was used by Baldizer. This
garage has double doors opening into the street on the east side,
and near the northwest corner of the garage is a small door

opening to the north. There is a small ditch with a platform across it, opposite this door, to the north of the garage. About a half mile southwest from the garage are located the clay pits where the appellant was employed. There is a line of railway track running from the clay pits in a general northeasterly direction until it reaches a point some distance north and west of the Baldizer house, where its direction turns nearly to the east. West of the garage is a line of trees that extends some distance north and south of the garage. About one o'clock in the morning of August 21, 1920, Baldizer returned home from having made a drive with his car. He evidently drove the car into the garage through the double doors on the east side, and then went out of the single door on the north side. When he stepped upon the platform in front of this door, an explosion occurred which severely injured him, and from the effect of which he died, on August 24th. Doctors and the police were summoned immediately, and after the police arrived, they discovered that dynamite had been placed under the platform referred to, and that there were wires stretching from this place in a northwesterly direction a distance of about 60 feet. The police arranged to have automobiles turn their lights on these wires, and prevented any interference with the same until about two o'clock in the afternoon following the explosion, when a party arrived from Waterloo with two bloodhounds, which were taken to the end of the wires, where it appeared that the weeds in the lot had been broken down, as though some person had lain there. At this place the bloodhounds were started, and they first followed a course around the cottages and around the garage, and seemed to go in a circle. They were again taken to the place at the end of the wires, and this time proceeded to the clay pits. At the pits they went to the steam shovel, where some of the appellant's clothing had been left. The appellant having been arrested in the meantime, and being lodged in jail, the dogs were taken there, and appellant and a number of other men were brought into the room where the dogs were; and when the dogs were released, they went to the appellant, and one of them put his paw upon the appellant, and lay down at his feet. The actions of the dogs will be discussed at greater length under a separate division of this opinion.

A few days before the tragedy, the appellant inquired of a witness if the latter could get him some fuse wire and caps. He said he wanted them for his brother-in-law at Charles City, who was going to blow up a rock. The witness testified that the appellant stated at the time: ''You can get it for me. There won't anybody know anything about it.''

Another witness testified that, on the morning of the 19th of August, the appellant had inquired of the witness if the latter could get the appellant some electric dynamite caps, and appellant explained to this witness that his brother-in-law wanted them, to shoot a rock at Charles City; that, on the afternoon of the same day, the appellant came to the place where the witness was employed, and asked if the latter had got the caps; that, on the morning of the 20th, the witness met the appellant, who informed him that ''he needn't bother,—that he had got them.''

Another witness testified that, on Monday of the week in which Baldizer was killed, he sold the appellant a pound of blasting powder; that he returned, the same day, or the next day, and informed the witness that the blasting powder did not work; and that at that time the witness sold him three electric caps.

On Wednesday, August 18th, the appellant purchased three or four sticks of dynamite and the blasting caps and fuses that went with it, and stated that he wanted the dynamite to blow up some stumps or rocks.

There was evidence that, two or three days before the tragedy, the appellant purchased 60 feet of insulated wire, and that, at the time of the purchase, appellant told the party from whom he bought it that he wished to light a dredge from a Ford.

There was evidence tending to show that a party resembling the appellant purchased a dry-cell battery at a store in Mason City, about August 18th, and also that another dry-cell battery was sold to a man resembling the appellant by another store during that week. The appellant is not positively identified as having been the purchaser of either of these dry-cell batteries.

On Thursday preceding the Saturday upon which the tragedy occurred, about four o'clock in the afternoon, appellant was seen near the clay fields where he worked, with a small package

under each arm. These packages were wrapped in newspaper. Two or three days before the tragedy, an explosion was heard in the clay pits, between eight and nine o'clock in the evening. No blasting was regularly done in this field. The appellant contended that he bought the dynamite, wire, and caps for the purpose of killing fish in the pond in the clay field.

The party referred to as appellant's brother-in-law denied that he had asked appellant to procure any dynamite for him.

The appellant was examined by the county attorney, in the presence of the court reporter, before the trial. There was a conflict between some of the statements made by appellant at said time and his testimony upon the trial. The particular items of evidence in this regard, it is unnecessary for us to set out.

The appellant is a Serbian, 24 years of age, and unmarried. He came to the United States in 1909, and to Mason City in September, 1909. For some time after he arrived in Mason City, he roomed in one of the Lehigh cottages, almost directly across the street from the Baldizer cottage, and while living there, about a year before the tragedy, he became acquainted with Baldizer and his wife, who was a woman about 30 years of age. Appellant and Baldizer's wife became intimate during the time he was living at this cottage. The wife testified that, on several different occasions, the appellant asked her to leave and go away with him. In the summer of 1920, the appellant went to Chicago, and remained for some time; and the woman testified that, after his return, he told her he returned because he could not stay away from her. She also testified that, after the appellant returned from Chicago, in the late summer of 1920, they were together at various times, and that appellant had sexual intercourse with her at her home at a time when the husband was down town. In the fore part of August, 1920, the woman went to Charles City, to visit people named Wezmar, who formerly lived across the street from her home, and with whom the appellant had at one time roomed. The appellant went to Charles City the same day, on a later train, and slept with Mrs. Baldizer at the Wezmar home that night, and had sexual intercourse with her then. They returned to Mason City together the next day. Mrs. Baldizer testified that, a few days after the trip to Charles City, she met the appellant in Mason City, and they went rid-

ing together in a car which she was driving, and that, at the time, the appellant repeatedly said to her, "Tell me the word," and that they talked quite a long time, and he finally said:

"Well, Anna, if you don't listen to me, you won't go farther with me, you feel sorry about it, you shed tears, you cry plenty."

Shortly after the injury to Baldizer, the appellant came to the Baldizer home, with a jug and an unlighted lantern, and said to a party there at the time that he had been sleeping, and came down to get some water, and saw an automobile stopping there, and came in the house.

The appellant started work in the clay pits, as night fireman, on or about August 10th, and worked from six at night until six in the morning. For some time prior to the tragedy, he had roomed and boarded on North Washington Street in Mason City, and in going to and from his work, he passed the Baldizer cottage, and stopped there frequently, and often secured a drink of whisky from Mrs. Baldizer. On the evening of the tragedy, he was seen to go past the Baldizer house on the way to his work, and to fill the jug with water at that time.

The evidence in the case is quite voluminous. We have attempted to outline only a brief portion of the same, sufficient for a consideration of the questions involved in this appeal.

I. The appellant challenges the sufficiency of the evidence to sustain the verdict of the jury. We have not set out nearly all the evidence, but only enough to indicate that it was suf-

1. HOMICIDE: murder: circumstantial evidence.

ficient to carry the case to the jury. The rule is so well established, and has been so frequently recognized, that a conviction of crime may rest upon circumstantial evidence, that it is unnecessary that we cite the authorities to sustain the rule. The evidence in this case was sufficient to carry the case to the jury.

II. The appellant produced Rosa Wezmar as a witness, and made the following written offer:

"The defendant offers to prove by the witness Rosa Wezmar

2. WITNESSES: impeachment: collateral issues.

that Anna Baldizer told her, in the year 1920, before Mike Baldizer's death, that, when Mike died, she would marry Charley Smanko, and be a doctor's wife."

The State's objection to this offer, as "incompetent, immaterial, and if offered for the purpose of impeachment, no foundation had been laid," and that it was not in any way defensive matter, was sustained.

The appellant offered to prove by the same witness "that Monday, after the death of Mike Baldizer, Charley Smanko, in a talk with her as interpreter for Sheriff Marsh, at Charles City, advised and asked her to testify that the defendant Grba forced Anna Baldizer to his room, and slept with her against her will." Objection to the offer was that it was incompetent and immaterial, and that, if it was for the purpose of impeachment, no foundation had been laid, and it would be immaterial even for the purpose of impeachment. The objection was sustained.

The appellant also offered to prove by a bank teller "that, on August 25th, after the death of Mike Baldizer, Anna Baldizer, accompanied by Charles Smanko, came to the First National Bank, and first asked to draw funds in said bank to the credit of Mike Baldizer, and were refused; that she then drew out $1,500, and left." The objection that the offered evidence was immaterial was sustained.

Smanko and Anna Baldizer were both witnesses for the State.

The contention of the appellant is that the offered evidence was material, as tending to show the bias and the hostile attitude of Smanko as a witness, and also as tending to show that Smanko was the party guilty of the offense.

We do not think the court erred in rejecting this testimony, upon the record. In no one of the three instances had any foundation whatever been laid for the introduction of the testimony, by cross-examination of the State's witnesses. *State v. McKinstry,* 100 Iowa 82, and *State v. Johnson,* 162 Iowa 597, 601, relied upon by the appellant, are not in point. In each of said cases, the foundation for the introduction of the testimony had been properly laid, on a cross-examination of the State's witnesses.

The matters inquired about were, in any event, quite collateral, and there was no error in rejecting the offered testimony, upon the record as it stood. While it is proper to show the interest, bias, and motive of a witness, it cannot be shown in

this manner, as a collateral issue, and without the establishment of a proper foundation for the introduction of the testimony. There was no reversible error here.

III. Appellant requested an instruction on circumstantial evidence. The court denied the requested instruction, but gave one on its own motion that covered the subject fully and care-

3. CRIMINAL LAW: instructions: patent fact.

fully. The particular complaint is that the jury was not "told directly that the evidence consisted wholly of circumstantial evidence." It is true that the court did not, in so many words, instruct the jury that the evidence in the case was wholly circumstantial, and that there was no direct evidence. It would, perhaps, have been better if the court had so stated in the instructions; but it was not reversible error to fail to do so. The jury could not have understood that there was any claim of any "direct evidence" of appellant's guilt. A jury must be credited with a reasonable degree of intelligence and comprehension. The court instructed the jury with care and at length on the subject of circumstantial evidence, and it was not reversible and prejudicial error for the court to fail to include therein a statement that there was no "direct evidence" in the case.

In the cases cited by appellant, the court instructed on both direct and circumstantial evidence, and failed to tell the jury that the evidence in the case was wholly circumstantial. Not so here, however. No instruction was given on direct evidence, and a correct instruction was given on circumstantial evidence, which was the only kind of evidence offered by the State. There was no reversible error at this point.

IV. The appellant requested the court to give the usual instruction with regard to the caution with which admissions are to be received. The court denied this request, and gave no

4. CRIMINAL LAW: admissions: cautionary instructions.

instruction on the subject-matter. The evidence in behalf of the State tended to show admissions made by the appellant to different witnesses, contradictory to his testimony upon the witness stand. The evidence was largely offered for purposes of impeachment of the appellant. A somewhat similar situation was before us in *State v. Jackson,* 103 Iowa 702, wherein we recognized the general rule that verbal admissions of a party should be received

with great caution, as that kind of evidence is subject to imperfections and mistakes. In that case, it was urged that it was error for the court not to caution the jury in regard to the testimony of one Lawson, a witness who testified to admissions made to him by the defendant. We therein said:

"The reason for the general rule is that such admissions often come from loose and random conversation, without a purpose to express what the hearers may understand. Conceding Lawson's statements to be true, the statements by Jackson seem to have been made deliberately and understandingly, in a conversation in which his purpose was to state the particular facts of his connection with the affray. Under such circumstances, we do not think a failure to caution the jury in the respect suggested involved error."

So, in the instant case, the failure of the court to give the instruction regarding the weight to be given the admissions did not constitute reversible error. The statements of the appellant were apparently made deliberately and understandingly, and were made in conversations in which he was being interrogated in respect to matters connected with the homicide, and in which his purpose was to state the particular facts of his connection therewith. There was no error at this point.

V. It is urged by the appellant that the court erred in failing to instruct the jury on any of the included offenses, the instruction being that the jury should find the appellant guilty of murder in the first degree, or not guilty.

Code Section 4730 provides that:

"Upon the trial of an indictment for murder, the jury, if it finds the defendant guilty, must inquire, and by its verdict ascertain and determine the degree."

Code Section 4731 provides that:

"Upon the trial of an indictment for murder, the jury, if it finds the defendant guilty of murder in the first degree, must direct in its verdict whether the punishment shall be death or imprisonment for life at hard labor."

The argument of the appellant is to the effect that these sections of the statute make it imperative that the question shall be submitted to the jury in all cases of indictment for murder,

**5. HOMICIDE: degrees of offense: deliberate and premeditated acts.** for it to determine whether the defendant is guilty of murder in the first degree or in the second degree. The general rule is that a failure to instruct as to an included offense is not error, where the evidence shows that the defendant is guilty of the higher offense or is not guilty of any offense. *State v. Cole,* 63 Iowa 695; *State v. Sigg,* 86 Iowa 746; *State v. Reasby,* 100 Iowa 231; *State v. Murphy,* 109 Iowa 116; *State v. Stanley,* 109 Iowa 142; *State v. Bertoch,* 112 Iowa 195; *State v. King,* 117 Iowa 484; *State v. Burns,* 124 Iowa 207; *State v. Thomas,* 135 Iowa 717; *State v. Ralston,* 139 Iowa 44; *State v. Dean,* 148 Iowa 566; *State v. Haywood,* 155 Iowa 466; *State v. Hessenius,* 165 Iowa 415; *State v. Nott,* 168 Iowa 617; *State v. Leete,* 187 Iowa 305.

It is the contention of the appellant that this general rule regarding the necessity of an instruction on included offenses does not apply where the indictment is for murder in the first degree, and where the murder has been committed in any other manner than by poison.

It must be confessed that, in *State v. Shepherd,* 129 Iowa 705, there is a statement in the opinion that tends to support the contention of counsel for the appellant; but that was a case where the defendant was indicted for murder in the first degree, and the court instructed on all the included offenses, and the defendant contended that it was error to instruct on any offense below murder in the first degree. The statement relied on was dictum.

Where the defendant in a criminal action is charged with murder in the first degree, and the indictment charges that the murder was committed by the use of poison, it has been held that it is not error to fail to instruct on any of the included offenses, and to submit to the jury only the question as to whether or not the defendant is guilty of murder in the first degree. *State v. Wells,* 61 Iowa 629; *State v. Smith,* 102 Iowa 656; *State v. Bertoch,* supra; *State v. Burns,* 124 Iowa 207; *State v. Thomas,* 135 Iowa 717.

We have also held that, where death resulted from a shooting, which fact was not in dispute, it was unnecessary to submit the included offenses lower than manslaughter. *State v. Perigo,*

80 Iowa 37; *State v. Sterrett,* 80 Iowa 609; *State v. Brown,* 152 Iowa 427.

We have also held that, where a defendant was charged with the crime of murder by shooting, it was not error on the part of the court to fail to submit any included offense below the crime of murder in the first degree. In *State v. Cater,* 100 Iowa 501, we said:

"In the instructions the court told the jury that, if the defendant was guilty of any crime, he was guilty of murder in the first degree. He submitted to the jury forms of verdict, accordingly. No instructions were given touching any lower degree of crime. Counsel refer to the statute, Code Sections 4465, 4466. These sections provide that, upon an indictment for an offense consisting of different degrees, the jury may find the defendant not guilty of the degree charged, and guilty of any degree inferior thereto, and that the defendant may be found guilty of any offense the commission of which is necessarily included in that charged in the indictment. But we have repeatedly held that the statute has no application when the facts show that the defendant is either guilty of the crime charged or not guilty, and that in such a case it is not incumbent upon the court to charge as to the lower grades of crime [citing cases]. It is manifest that in this case, if the defendant is guilty, it is of the crime of murder in the first degree."

Our latest pronouncement on this question is in the case of *State v. Quan Sue,* 191 Iowa 144, where the defendant was charged with murder by inflicting a bullet wound, from which death resulted. In the opinion in that case, we said:

"If, in a given case, the evidence shows conclusively that the crime committed was murder in the first degree, or nothing, the court is not required to submit the lower degree."

We also said:

"We have repeatedly held that it is not error to fail to submit an included offense of which there is no evidence."

In the case at bar, the appellant was guilty of murder in the first degree, or was not guilty of any offense. In other words, whoever committed the act of killing by placing dynamite where Baldizer would be killed by its explosion was guilty of no other crime than murder in the first degree. Every es-

sential element of such crime is present. The killing could not have been the result of accident. It could have been only the result of design. Under the undisputed evidence, it was done deliberately and premeditatedly, and with the specific intent to kill. It was, therefore, murder in the first degree, and the court did not err in failing to submit to the jury the question of murder in the second degree or any other of the included offenses. It is manifest that, if the appellant is guilty of the crime, he is guilty of murder in the first degree, and nothing else.

VI. This brings us to the question of the admissibility of the testimony as to the alleged trailing and identification of the appellant by bloodhounds. Two dogs were brought from Water-

6. CRIMINAL LAW: evidence: conduct of bloodhound.

loo, and arrived in Mason City the afternoon following the tragedy. As we have stated, the police had, in the meantime, kept a guard over the premises, and prevented anyone from going to the spot about 60 feet from the garage where the appearance of the weeds indicated that someone might have lain.

We may be pardoned for incumbering this opinion with the evidence of the owner regarding the breeding and training of these dogs. He testified as follows:

"I am a member of the city fire company, and am the owner of a kennel of bloodhounds, used for man trailing. They are the English breed. The dogs I brought here on the 21st of August,—the oldest dog is Gyp D, and the youngest one is Pansy B. I have been engaged about 8 years in breeding and in the training of bloodhounds. The English dog, history tells us, is the only pure and original bloodhound strain that there is, and all other strains of bloodhounds are bred from the English dogs. They were bred back in England for centuries. Gyp and Pansy are pure-bred dogs. Gyp is 5 years; was born on the 15th day of July, 1915. Pansy is just a pup. I raised this Pansy dog; and the Gyp dog, I bought her when she was about 5 or 6 months old. They are pedigreed and registered. I have the pedigree with me. I have them here. That is Gyp's pedigree and registration blank, and this is Pansy's. They are registered in the American Kennel Club. The American Kennel Club is an organization or association that is maintained for the

purpose of registering and keeping record of pure-bred blood-hounds and all other pure-bred dogs. If Gyp and Pansy were not pure-bred bloodhounds, they would not be entitled to registration, under the rules. Gyp was just a pup when I received her. Since being engaged in raising and training bloodhounds, I have trained a great many dogs. It would be pretty hard to say just how many, but I would be safe in saying, hundreds of them. I have made it a business of raising dogs for hunting purposes and for show purposes and all kinds of hunting dogs and trick dogs, and made a specialty of raising those kinds from several different strains of dogs. These dogs have been trained to follow nothing but just the human trail. The dog is better when he is trained to just trail one thing. I trained Gyp about a year before I put her on actual work. Pansy was 9 months old when I put her into criminal work. I commenced to train her at about 4 months. When I first start a young dog out, we take him and I take my boy, a young lad of 8 years old, and let him feed the pups and take the pup's feed,—take the pup out and let the boy show the pup his food, and then start and go out of the pup's sight as quick as he can. Well, then, the puppy is hungry, and he will want to go to the boy because he knows he has got the food there for him, and when he goes to where he saw the boy last, the only way the dog has of finding the boy is to use his nose and to find him. Well, after the dog will do that, take him in the morning, and every time he feeds him, make the dog make his nose earn his feed; and after a few days of that, just take the boy out and let him stand by a tree, or any place, and mark the place on the ground to know where he was, and take the pup over and tell him to smell of that spot, and then go find him. The dog will go ahead and follow the trail until he gets to where the young fellow is, and then the young lad will feed him; and I do that and keep on doing that, and try him on some girl or my wife or some of the neighbor's children; and after the dog has had a week or so of that kind of trailing, then we take the dog and change him over onto different trails, and keep making the trails a little more difficult and a little longer and a little older; and if the trail is—say the dog runs a 5-hour trail this morning,—if he falls down on it or is slow, the next trail in the afternoon is a

5-hour trail for him to run, and keep him on that until he is used to that old scent, and then keep drawing it longer and stretching it out until your dog will run what we call an overnight trail,—that is, a trail made one night and run in the morning; and keep switching them back and forth; and then have a man make a trail on the road, and have a rig to get into, and go and get off at a certain place that we know where he gets off, and we trail him with the dogs to this spot where the dogs lose the trail, and let the dogs work all around, and then take the dog in the car and take him close to where this man has hit the ground again, and begin circling around until he crosses this trail, and when he hits that trail, he will beller and go on. They will just come up to a man and smell him all over. When they are on the trail, they give tongue. When a dog is off the trail and running around, he runs mute, and when he strikes the trail, he bellers; he will bawl and go on. I have used these two dogs quite a bit in exhibition work. * * * Some dogs are trained so that, when they locate their man, they are fierce; while others show a friendly spirit. My dogs are trained peaceable. When they locate their man, they come along to the man, like if the dogs were trailing this man here, the second man, they would come in here on his trail, and come up to him and smell him all over. A stranger that didn't know the dog was on his track would think that the man owned the dog, and the dog was glad to see him; and the dog would pay no attention to the rest of us around here. These dogs will work a trail as long as from one hour to forty. * * * We drove into the settlement right to within a half a car's length of the garage where the man was blowed up. * * * I walked out to the end of the wire, and I could see plainly where a man had been lying down. * * * I took both dogs and led them out to the end of the wire, and I put my hands down on the ground, like that, and both dogs stuck their noses down to where my hands were. I says, 'Man gone,—get him.' That is the words I use in starting my dogs. * * * I started my dogs at the end of this wire. The dogs started, and they came over right along the wire back past this garage and into the street, and then they followed around back and forth around there a little bit; they worked around quite a little bit. * * * We went down this street a little ways, on the

road between 53 and 47. We went east through this road, and there is gates in there, and a path that goes up by a house, and we went around this house. If I remember right, Baldizer lived in this house,—the man that lost his life. Well, we went over to this house and came through a kind of a path through there, and out another gate, and kind of worked down this way, and swung around and back over,—the general trend being east and south,—and we went through that gate and out into the street. Yes, sir, it was the place where Cottage 29 is indicated,—just about where 29 would be; and through the street and down to about Cottage 32, we went into the yard. Yes, sir, we went east on the street which would be south of the row of cottages in which 29 is; and at that gate, the dogs went in that gate. That is the gate into Cottage 32; and they came back to the gate and went over to this road going out to the main road, and went through this main road and then across and over to a little store here. They went right along this little store, and stopped and turned here. They went to the steps of the store, but they were satisfied to go on, and then they came over kitty-cornered back across the road. Yes, that is the place where it is marked 'road,' clear to the south of the plat. This is the main road through there, if I remember right. They came kitty-cornered across here, and down along the path and into about this street here. Yes, sir, it is the only street going north in the south row of houses past them. They came right up to this house here, where the willows are, right down through here again,—that is, back to the garage; and then they began to work back and forth around this garage. There was a lot of blood on the ground. They would be over where that was, and then back and swung up here and started on about the same trail again. They then swung and went back. * * * I took the dogs by the collars at this garage, and took them out to the end of this wire again, to kind of refresh them on their scent, and let them start over; because they had made a complete circle with me, and they were back in where this muddling of the tracks were. They were nosing the ground all over and bellering. * * * Where a man has went around in a circle and back and all over those tracks, it puzzles a dog quite a bit, and it is hard for him to get away. His tracks are all crisscrossed, and no straight trail for him to follow,

and he does a lot of stammering and swinging and circling before he finds a way to get away; and that is what made me take my dogs back to the end of the wire again, to let them straighten out and come through again. And they came back toward the garage, and swung out west and right straight out across the stubble field, and went out kitty-cornered across the stubble field to a road, and down this road to where there was a big hole in the ground and a lot of dirt taken out; and they went up along this here bank, and kind of along the edge of the bank there was an engine or shovel set right up in here. There is a place marked 'shovel' on here. It might have been set back 100 or 150 feet; but the dogs went to this shovel. The Gyp dog stood up to the entrance way that goes up in, and barked. There was a pair of overalls there, and she smelled the overalls all over. I watched them a little bit, and they kind of worked around the shovel and came back in this path and went down to a high bank right around in here. They came down the path, right down along through here, and they stopped. Probably right in there, where you put an X. And we struck that path just about there at that time, and they went down the path and over here and down a bank over on the bottom where the dirt had been taken out over across a little ditch to another engine, and there a plank goes across this track. There was a big shovel in there. That is about the place. There was a plank going across there, probably 20 feet. The dog went across. I just let her strap go, and she went across that plank to the door and nosed around and barked, and came up the plank where I was, and started over up along some railroad tracks, and made a swing. There might have been a man over there, but the bulk of them all stayed over at the road. I was all alone at the time from that place on. After I came down to this place, the mud was pretty deep, and the rest of them didn't come on account of the mud being so bad, I guess. Then we went across the tracks,—along where it is marked railroad tracks. Sometimes they was on the railroad tracks, and sometimes the path led off of it; but they went around off here to where this other track comes. I think I cross just about in there, from one track to the other. * * * They then came down across the field just about that angle to the back end of that

garage, pretty near to where the garage was, and about a hundred feet, and crossed to the willows, and there is another garage over here. They went down along the end of those willows across the willows back of this building, and there is a garden in there, and they went down that strip of willows about to the end of the willows, and turned and right straight back past this here cottage. The willows are back of this here building, further down, about over in here. The place where you mark X3 is about where I think the end of the willows run; and then they come right straight back up around this row of willows on the other side, on through past this garage again, and then they begun to monkey around and work on the ground pretty heavy in where this blood had been, and they went through here and started down here and back, and stopped and swung back, and I judge about to over there again. They were kind of puzzled in there a little. The officer came up there, the deputy sheriff, and he says, 'What is the matter?' And I says, 'We will have to wait a little bit here until I kind of get the dogs straightened out here.' I says, 'We are in a circle here, and we can't get away.' I says, 'It is evident that my man has left the ground right here.' If a man had got off the ground there, it would have been the same indication of the dogs that the track had ended, and they was trying to get away. And he said, 'We have a man locked up down there at the jail.' And he says, 'We will take the dogs down.' That was the first intimation I had that they had a man down to the jail. * * * After the sheriff said there was a man down in the jail, I put the dogs in a car. We came down town in the same car that we went out in. I took my dogs into the sheriff's office, and the sheriff says, 'We will have the men walk by the dogs,' and he says, 'I want you to see if you can pick the man that we have, and see if we have the right man or not, if the dogs know.' I did not know who the man was. He was a perfect stranger to me, and I didn't know what kind of a looking man he was. There was quite a few fellows came in the sheriff's office and came by, and the dogs stood at leisure, right side of me. I didn't have no strings on them or nothing. There was probably five or six men went by, and then there was three men came in and started by. When they came up by us, both dogs

turned and begun to kind of swing their heads, and went over
to this one man. They smelled of him, and he kind of held his
hands up, like this. One dog was smelling of his shoes, and
the other kind of smelling around here on him.''

The witness also detailed at considerable length the manner
in which he had seen the dogs perform in trailing men under
various circumstances.

The question of the admissibility of evidence of the trail-
ing of a criminal by bloodhounds has been before a number of
the courts, and has been discussed by various textwriters. The
only time this question has been before this court in any form
was in the case of *McClurg v. Brenton,* 123 Iowa 368. In that
case, however, the precise question here presented was not in-
volved, and the case is not determinative of this case.

The courts of the country are by no means in agreement
upon the question of the admissibility of this testimony. Such
evidence has been recognized as admissible as a circumstance
in the trial of a criminal case in the states of Alabama, Ohio,
Kentucky, North Carolina, Kansas, Florida, Texas, Georgia,
Mississippi, Arkansas, Missouri, Louisiana, and West Virginia.
It has been expressly rejected by the Supreme Courts of the
states of Nebraska, Illinois, and Indiana.

It must be conceded that the numerical weight of the cases
is in favor of the admission of testimony of this character, where
the proper foundation is laid with respect to the purity of the
breeding and the efficiency of the training of the dog. In
*Brott v. State,* 70 Neb. 395 (97 N. W. 593), the court said:

"But difficulties do not deter the bloodhound from pursu-
ing his business. He trails as best he can. He always follows
some scent, and he goes somewhere. Undoubtedly, nice and
delicate questions are time and again presented to him for de-
cision. But the considerations that induce him, in a particular
case, to adopt one conclusion rather than another cannot go to
the jury. The jury cannot know whether the reasons on which
he acted were good or bad; whether they were all on one side
or evenly balanced; or whether his faith in the identity of the
scent which he followed was strong or weak. In attempting to
separate one smell from ten, twenty, fifty, or a hundred similar
smells with which it is intermixed and commingled, it is highly

probable, if not quite certain, that the bloodhound undertakes a task altogether beyond his capacity. Like other dogs, he has his limitations, and they must be recognized in courts of justice, if not elsewhere. That the conclusions of the bloodhound are generally too unreliable to be accepted as evidence in either civil or criminal cases is, we believe, the teaching of that common knowledge and ordinary experience which we may rightfully bring to the examination of this subject. * * * It is unsafe evidence, and both reason and instinct condemn it.''

In *People v. Pfanschmidt*, 262 Ill. 411 (104 N. E. 804), the court said:

''A bloodhound may be used to track down a known fugitive from justice. If the dog, in fact, takes up and follows the trail of a known fugitive and finds him, or aids his pursuers to find him, there can be no mistake as to whether or not he is the party sought. His guilt or innocence of a given crime, however, should be established by other evidence. Neither court nor jury can have any means of knowing why the dog does this thing or another, in following in one direction instead of another; that must be left to his instinct, without knowing upon what it is based. The information obtainable on this subject, scientific, legal, or otherwise, is not of such a character as to furnish any satisfactory basis or reason for the admission of this class of evidence. We agree fully with the statement in *Brott v. State*, supra [70 Neb. 395 (97 N. W. 593)], that the 'conclusions of the bloodhound are generally too unreliable to be accepted as evidence in either civil or criminal cases.' ''

In *Ruse v. State*, 186 Ind. 237 (115 N. E. 778), the Supreme Court of Indiana reviewed the cases at considerable length, and said:

''When it is considered that the use of bloodhounds, even under the most favorable conditions, is attended with some degree of uncertainty, which may readily lead to the conviction or accusation of innocent persons, and that, at best, evidence as to their conduct in following a supposed trail is properly not of great probative value, it follows, as is suggested in *Brott v. State*, 70 Neb. 395 [97 N. W. 593, 63 L. R. A. 789], that both reason and instinct condemn such evidence, and courts should

be too jealous of the life and liberty of human beings to permit its reception in a criminal case as proof of guilt.''

In the leading case of *Pedigo v. Commonwealth,* 103 Ky. 41 (44 S. W. 143), Guffy, J., dissenting, said:

''If it should even be conceded that every owner and trainer of hounds would be perfectly fair and impartial in endeavoring to strike the trail only of the party who had been at the scene of the crime, and likewise impartial in his testimony as to the expertness of the dog, yet such evidence is entirely too vague and uncertain to be allowed to jeopardize the liberty of a free man. * * * It would be impossible to demonstrate whether or not he found the actual trail at the spot to which he was taken, or whether, as all dogs will do when it is sought to put them on a trail, he commenced hunting for one, and so continued until a trail was found in that vicinity. It may also be assumed as certain that the hound would take up the first trail or follow the first trail that reached or affected his olfactory nerves after it was made known to him that he was there for the purpose of trailing somebody. I do not think it is possible to establish the fact that the hound will not quit the first trail that he may take up, and go off with another which he might happen to fall in with or cross. * * * The trailing of the hound, if evidence at all, must be upon the supposition that he took the track at the scene of the crime, and followed it; but the defendant has no chance to inquire of the hound how far from the place did he really find the trail, or did he cross any other or find any others. If a person was testifying to having tracked the defendant from or about the place, he could be cross-examined upon that subject to know whether there was any other track, and which appeared to be the freshest, and size, and whether the trail he was following crossed or fell in with other trails. Not so with the dog. He has had his say, and left. * * * It seems to me that the use of the bloodhound properly belonged to the days of slavery, and of the bloody criminal code of the Dark Ages; and, inasmuch as the institution of slavery and the code aforesaid have ceased to exist, the hound should be relegated to innocuous desuetude.''

It is a ''theory'' that microscopic particles of effluvia emanate constantly from the body of every living human being, and that these particles possess an odor characteristic of the particu-

lar individual. It is supposed that the highly developed olfactory nerves of the bloodhound enable him to detect the peculiar odor of these particles, and thus to follow the "trail" of any particular person. How this is possible is not a matter of ascertainment. Scientists are baffled. The dog only knows. How long the particles exist after the person has passed has likewise never been scientifically demonstrated. The "scent" is referred to as being "cold" or "fresh." Time and atmospheric conditions are supposed to affect it.

In the instant case, something like twelve or thirteen hours elapsed between the time of the murder and the placing of the dogs on the trail. This, too, in the latter part of the month of August, in the climatic conditions that prevail in this state at that time.

We have already quoted at length from the testimony. It appears from the evidence of the owner of the dogs that in this case he led the dogs to the end of the wire near the garage, and put his hands down on the ground, and the dogs stuck their noses down where his hands were. He then informed the dogs that a man was gone, and instructed them to "get him." He says:

"I started my dogs at the end of this wire. The dogs started, and they came over right along the wire back past this garage and into the street, and then they followed back and forth around there a little bit. We went down this street a little ways on the road between 53 and 47. We went east through this road, and there is gates in there, and a path that goes up by a house, and we went around this house. If I remember right, Baldizer lived in this house,—the man that lost his life."

He describes in detail that the dogs went south and east, and went in at the gate at cottage No. 32, and then over to a little store, where they stopped and turned, and then, after various maneuvers, came back to the garage, and began to work back and forth around it. The owner then took them by the collars, and took them out to the end of the wire again, and started them once more, and this time they came back toward the garage, as they had done before, and then turned west, instead of east, and went across the stubble field to a road, and down this road to the clay pits.

Were the dogs right when they started to the east and south and went among the cottages and over to a little store and then back across the road and finally returned to the garage, or were they right when they again were taken to the same spot at the end of the wire, and this time started off in practically the opposite direction and went to the clay pits? Which scent was the correct one?

The evidence of the State shows that the appellant was seen near the Baldizer cottage in the evening prior to the accident; that he filled a jug with water, and went in a southwesterly direction toward the clay pits. Was it *this* trail that the bloodhounds followed? Who can tell?

Again, the evidence shows that, shortly after the tragedy, the appellant was at the Baldizer cottage, and that he then had his lantern and jug with him. Did the dogs follow the trail he made in coming from the clay pits at this time? Or did they follow one he made in returning to the clay pits, after having been to the cottage on this occasion? How may we know? How near must he have passed to the spot near the end of the wire to have left a ''scent'' on these several trips? How many different ''scents'' did the dogs discover? Other like questions readily suggest themselves, upon a reading of the record in this case.

The evidence is in the nature of expert testimony, with no opportunity whatever to cross-examine the expert or to find out from any source any reason for the conduct of the dogs, or why they should choose one direction, or one trail, rather than another, as was done in the instant case.

Notwithstanding that the majority of the courts of the country, especially in the southern states, have sustained the admissibility of evidence of this character, we are disposed to the view that the better reasoning requires that such evidence should be excluded, and we are inclined to ally ourselves with the Supreme Courts of Nebraska, Illinois, and Indiana, in rejecting such evidence. The life and liberty of any citizen should not be placed in jeopardy or be forfeited upon evidence of the conduct of a dog. The instant case furnishes an excellent sample of the inherent weakness of evidence of this character.

All of the courts that admit such evidence concede that it

is merely a circumstance, and is "of the weakest character." If the bloodhound is infallible because of his animal instincts, then evidence of his conduct in tracing a human being would rather be of the highest character than "merely a circumstance of the weakest character." If invariable animal instinct guides him accurately in the matter, then his conduct in trailing an alleged criminal would be quite conclusive. It is conceded by all courts, and must be, from the facts of the case, that the bloodhound is not infallible; that he does make mistakes; and that he does not invariably follow a trail without deflection therefrom, and with absolute certainty. In other words, the bloodhound may be right in what he does, and he may be wholly wrong. How is it possible to know in any particular case whether he is right or wrong?

We are constrained to hold that the trial court committed error in the admission of this evidence and in submitting this question to the jury, and for that error the judgment of the district court must be, and it is,—*Reversed.*

PRESTON, C. J., WEAVER, EVANS, STEVENS, and ARTHUR, JJ., concur.

DE GRAFF, J., dissents.

DE GRAFF, J. (dissenting). The question of the admissibility of evidence of the trailing of a criminal by bloodhounds is not novel. The earliest case that involved this question was *Hodge v. State,* 98 Ala. 10 (13 So. 385), decided in 1893. In that case, the evidence showed that tracks were seen near the place where the crime was committed, which were easily followed to a place near the home of the defendant. A bloodhound followed these tracks, and went to defendant's house. It was held that evidence of what the dog did was admissible as a circumstance to be considered by the jury.

The rule admitting such evidence has been followed in Alabama in *Simpson v. State,* 111 Ala. 6 (20 So. 572), and *Hargrove v. State,* 147 Ala. 97 (41 So. 972).

In *State v. Hall,* 3 Ohio N. P. 125, decided in 1896, the fact that a bloodhound followed a trail about 200 feet from where the stolen goods were hidden in a basket, to the defendant's

house, was held admissible as a circumstance to be considered by the jury.

In *State v. Dickerson*, 77 Ohio St. 34 (82 N. E. 969 [1907]), evidence was offered as to the conduct of the dogs which were taken to the scene of the murder. The history and experience of the dogs were given, and testimony as to their conduct. The court reviewed the authorities in the various states up to that time, including the case of *McClurg v. Brenton*, supra, from which it quotes at length, and said:

"But we think that, from a comparison of the views expressed by the different courts from whom we have quoted, there may be deduced a rule which, until shown untrustworthy, may be followed in cases where this class of evidence is offered. It is apparent that, before the acts and conduct of the dog can be shown, a proper preliminary foundation must be laid, and to establish such foundation it must be shown that the particular dog used was trained and tested in tracking human beings, and by experience had been found reliable in such cases; that the dog so trained was laid on the trail, whether it was visible or invisible, at a point where the circumstances tended clearly to show that the guilty party had been, or upon a track which the circumstances indicated to have been made by him. In addition to this, the reliability of the dog must be proved by a person or persons having personal knowledge thereof. This foundation may be strengthened by proof of pedigree, purity of blood, or the exalted standing of his breed in the performance of such peculiar work."

In *Pedigo v. Commonwealth*, 103 Ky. 41 (44 S. W. 143 [1898]), the court, in the majority opinion, said:

"After a careful consideration of this case by the whole court, we think it may be safely laid down that, in order to make such testimony competent, even when it is shown that the dog is of pure blood, and of a stock characterized by acuteness of scent and power of discrimination, it must also be established that the dog in question is possessed of these qualities, and has been trained or tested in their exercise in the tracking of human beings, and that these facts must appear from the testimony of some person who has personal knowledge thereof. We think it must also appear that the dog so trained and tested was laid

on the trail, whether visible or not, concerning which testimony has been admitted, at a point where the circumstances tend clearly to show that the guilty party had been, or upon a track which such circumstances indicated to have been made by him. When so indicated, testimony as to trailing by a bloodhound may be permitted to go to the jury for what it is worth, as one of the circumstances which may tend to connect the defendant with the crime of which he is accused. When not so indicated, the trial court should exclude the entire testimony in that regard from the jury.''

There was a vigorous dissenting opinion in this case.

In *State v. Moore,* 129 N. C. 494, 498 (39 S. E. 626), the court held that the evidence was insufficient to permit the question of the trailing by the dogs to go to the jury, although recognizing the rule that such evidence is admissible where a proper showing is made. .

In *State v. Adams,* 85 Kans. 435 (116 Pac. 608), it was held that, on the establishment of proper preliminary proof, evidence of the conduct of bloodhounds was admissible, its weight to be determined by the jury. There was a dissenting opinion in this case, however.

In *Davis v. State,* 46 Fla. 137 (35 So. 76 [1903]), it was held that, in order for the evidence regarding the conduct of a dog to be admissible, ''there must be preliminary proof of such character as to show that reliance may reasonably be placed upon the accuracy of the trailing attempted to be proved. * * * The intelligence, training, and purity of breed are all proper matters for consideration in determining the admissibility of such evidence, as is also the behavior of the dog in following the track pointed out.''

In the case of *Parker v. State,* 46 Tex. Cr. 461 (80 S. W. 1008 [1904]), the track of the supposed murderer was discovered and trailed from that point to the residence of the defendant, a distance of about a mile and a half. The dog followed the track which witnesses saw upon the ground, and which they described. The court quotes from the majority opinion in the *Pedigo* case, and says:

''It is a matter of common knowledge and observation that trained animals of the hound species are capable of trailing and

following tracks of human beings, and they have been used time out of mind for that purpose."

.       In *Aiken v. State,* 16 Ga. App. 848 (86 S. E. 1076 [1915]), the court reviewed the cases at length, and held that, where it appeared that the person testifying is reliable, and that the dog was trained and able to follow a track under given circumstances, and did so follow a track, such evidence was admissible, to be considered by the jury under proper instructions of the court.

To the same general effect, holding that such evidence is admissible, see *Carter v. State,* 106 Miss. 507 (64 So. 215); *Holub v. State,* 116 Ark. 227 (172 S. W. 878); *Padgett v. State,* 125 Ark. 471 (188 S. W. 1158); *Harris v. State,* 17 Ga. App. 723 (88 S. E. 121); *State v. Hunter,* 143 N. C. 607 (56 S. E. 547); *State v. Spivey,* 151 N. C. 676 (65 S. E. 995); *State v. Wiggins,* 171 N. C. 813 (89 S. E. 58); *State v. Rasco,* 239 Mo. 535 (144 S. W. 449); *Commonwealth v. Hoffman,* 52 Pa. Sup. Ct. 272; *State v. King,* 144 La. 430 (80 So. 615); *Sprouse v. Commonwealth,* 132 Ky. 269 (116 S. W. 344); *Blair v. Commonwealth,* 181 Ky. 218 (204 S. W. 67); *Denham v. Commonwealth,* 119 Ky. 508 (84 S. W. 538); *State v. Yearwood,* 178 N. C. 813 (101 S. E. 513); *Troup v. State,* 26 Ga. App. 623 (107 S. E. 75); *State v. Robinson,* 181 N. C. 516 (106 S. E. 155); *State v. McKinney,* 88 W. Va. 400 (106 S. E. 894); *Loper v. State,* 205 Ala. 216 (87 So. 92); *State v. Harrison,* 149 La. 83 (88 So. 696); *West v. State,* 150 Ark. 555 (234 S. W. 997); *Adams v. State* (Ark.), 235 S. W. 372; *State v. Davis,* 149 La. 1009 (90 So. 385).

In South Carolina there is a statute (Criminal Code, Section 940) providing for the use of bloodhounds, or other serviceable dogs, for the tracking and arrest of escaped convicts and other fugitive lawbreakers. See *State v. Brown,* 103 S. C. 437 (88 S. E. 21).

In 2 Elliott on Evidence, Section 1253, it is said, regarding experiments with bloodhounds:

"There is no certainty in such evidence. It is really the dog that is the witness, and the evidence would seem to be hearsay in this view."

The author, however, recognizes the decisions of the courts in holding that, where the proper foundation has been laid in

respect to qualifications of the dog, the testimony is admissible, as a circumstance.

In 1 Wigmore on Evidence, Section 177, the author said:

"It is conceded by most courts that the fact that a well trained and well tested bloodhound, of good breed, after smelling a shoe or other article belonging to the doer of a crime, has tracked definitely to the accused, is admissible to show that the accused was the doer of the criminal act."

The general rule as to the admissibility of such evidence is recognized in Underhill on Criminal Evidence (2d Ed.), Section 374-a, and 3 Chamberlayne on Modern Law of Evidence, Section 1760.

There is an interesting article on "The Bloodhound as a Witness," by Judge McWhorter, of West Virginia, in 54 American Law Review 109.

There are three cases that hold squarely to the doctrine that such evidence is not admissible in the trial of one charged with crime. The leading case in the United States holding that such evidence is inadmissible is *Brott v. State*, 70 Neb. 395 (97 N. W. 593). This case has been reviewed in many of the cases cited supra. See, also, *People v. Pfanschmidt*, 262 Ill. 411 (104 N. E. 804); *Ruse v. State*, 186 Ind. 237 (115 N. E. 778).

It is evident that the great numerical weight of the precedents sustains the proposition that evidence of trailing a criminal by a trained bloodhound is admissible as a circumstance to be considered by a jury, with other evidence in the case. Instinct is not unerring; neither is reason. The mere weakness of evidence does not make it incompetent. There are certain limitations upon the admissibility of such evidence, however, and from a careful examination of all of the cases cited, I deduce the following general propositions regarding such evidence.

It must first be shown that the dog is a pure-bred hound, or, in other words, is in fact "a bloodhound." The popular notion that such an animal is ferocious and bloodthirsty is a misconception. He is called a "bloodhound," not because of any characteristics of being fierce and savage, but because he is a "blooded"—pure-bred—hound. As a matter of fact, he is naturally kind, affectionate, and docile. In times of slavery, his lusty bay was terrifying to the superstitious fugitive; but

as a matter of fact, he is a living exemplification of the ancient proverb, ''his bark is worse than his bite.'' The pure-bred hound has a remarkable keenness of scent and especial adaptability to following a trail. Encyclopedia Brittanica, article ''dog.'' All of the authorities agree that, before evidence regarding trailing by a dog can be admitted, it must first be established that the dog is a hound of pure breed, and this must be established by competent evidence. See *McClurg v. Brenton,* supra. Again, it is imperative that, as a prerequisite to the admission of such testimony, it must first be established that the dog has been thoroughly and carefully trained to trail human beings, and that he has been tested and proven to be capable of doing so with accuracy and reliability. This must depend upon human testimony, to establish the ability, accuracy, and reliability of the animal; and if this evidence is based merely on conjecture or opinion as to the capabilities of the dog, the foundation for the introduction of the evidence as to the actions of the animal in attempting to trail a man is utterly lacking. Again, before the evidence of the dog's actions can be received, it must be established that there was an unmolested, fresh trail upon which the dog was given the scent. In some of the cases cited, there were visible marks of human footprints where the dog was given the scent. In other cases where the evidence was received, the dog was used in the pursuit of a known fugitive, and the dog had received the scent from some wearing apparel or other object with which the fugitive had been associated. But numbers of the cases hold that the evidence is admissible even when the party sought is unknown, and when there are no visible marks, like footprints, to follow, and no available article from which the scent may be obtained. In such cases it is, however, apparent that there must be a place or spot where it is proven that the party sought has recently been, and that *no other person* has been at such place since the criminal was there, and that the scent has not been interfered with by rain, by the presence of other persons, or in any other manner. In other words, the actions of the dog in trailing a party can only be shown in evidence when it is first proven that the animal started on an uncontaminated and fresh scent. It must also appear that the movements of the animal were not interfered with in

any manner by the keeper or any other person or persons during the trailing. If these matters are not all established, the evidence regarding the conduct of the dog in trailing a party accused of crime is inadmissible, and should not be received in evidence.

If the essential requisites recognized by the courts are established, the evidence is, at best, but a circumstance, and must be considered as such. Courts that admit such evidence are express in their declarations that a conviction could not rest on such evidence alone. Such evidence is of a very low order. It is not improper to say that it is in the nature of expert testimony, without affording any opportunity to cross-examine the expert. It must rest, in the first instance, wholly upon the veracity and honesty of the person who testifies to the breeding, training, and reliability of the animal.

In all instances where the evidence is admissible, the court should carefully instruct the jury in regard to the subject-matter, and that the jury must find that the essential facts regarding the receipt of the evidence are established; and the jury should be cautioned to consider the evidence of the actions of the dog as only a circumstance in the case.

The court instructed the jury as follows:

"The evidence in this case relative to the work of the dogs should be cautiously weighed, and with discriminating judgment. If you find from the facts and circumstances in the case, beyond a reasonable doubt, that the dogs were taken to the place occupied, prior to and at the time of the explosion, by the person, if any, who caused such explosion resulting in the death of Mike Baldizer; that at such place the dogs obtained the scent of such person; that, by reason of the breeding of said dogs, their nature, prior training, and experience, said dogs were capable of tracking or trailing a human being without aid or suggestion in the progress of their work, and that, unaided, they did so in the surroundings and conditions disclosed by the evidence in this case; that the dogs possessed the power to, and in their work aforesaid did, discriminate between the alleged trail on which they had first been laid, as stated above, and the trail or scent, if any, of any other person or thing which came within their range during the progress of their work, and did pursue

from the beginning to the close of their work the trail made by one and the same person, and no other, if made by a person; and you further find, from the evidence introduced upon the trial, beyond a reasonable doubt, that the immediate surroundings and conditions existing at the time and place when and where the dogs finally terminated their work, as shown by the evidence, clearly pointed to the defendant as the person who had made such trail, if any, then you may give to such evidence the weight, if any, you believe the same fairly entitled to, as a circumstance bearing upon the guilt or innocence of the defendant. Unless you so find, you should give no weight whatever to such testimony.''

The proper foundation appears to have been laid to admit the introduction of the testimony of the actions of the dogs, as a circumstance to be considered by the jury for what it was worth; and the court instructed the jury that it could only be considered for that purpose. Were it the only evidence tending to connect the appellant with the commission of the offense charged, I would unhesitatingly refuse to let a conviction rest upon it. But such is not the case. There was sufficient evidence to not only carry the case to the jury, but to sustain a verdict of guilty, entirely apart from this evidence regarding the dogs.

The judgment of the district court, in my opinion, should be affirmed.